## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Dan Norberg and Susan Norberg as co-trustees for the next of kin of Nickolas Daniel Norberg, Deceased, | Civ. No. 24-cv-02023 (JMB/LIB) |
| Plaintiffs, | **ANSWER FOR STEARNS COUNTY DEFENDANTS** |
| v. | |
| CentraCare Health System d/b/a CentraCare – St. Cloud Hospital, The Saint Cloud Hospital d/b/a CentraCare – St. Cloud Hospital, CentraCare Clinic, Daniel Falvey, M.D., Catherine Standfuss, APRN, in her individual capacity, Sgt. Steven Polack, in his individual capacity, Makayla Epple, in her individual capacity, Micah Theis, in his individual capacity, and Stearns County, Minnesota, | |
| Defendants. | |

---

Defendants Stearns County, Sergeant Steven Polack, Makayla Epple, and Micah Theis (hereinafter "Answering Defendants" or "Defendants") for their Answer to the Plaintiffs' Complaint, state as follows:

Except as otherwise expressly omitted or qualified, these Answering Defendants deny each and every allegation in the Complaint.

### <u>Introduction</u>

1.      The last five hours of Nick's life were spent slowly spiraling towards an agonizing yet avoidable death. Nick pleaded for help. He told healthcare providers and correctional staff that he could not breathe and was dying. But no one listened. Nick was

failed by many from both the health care and correctional systems and was left to die inhumanely. His father and the mother of his children now bring this action asserting federal civil rights and supplemental state law claims to seek accountability for his death.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding healthcare providers. Defendants deny the remaining allegations contained in Paragraph 1 of the Complaint.

### Parties

2.      Nick was at all relevant times a 37-year-old man residing in Minnesota.

**ANSWER:**   These Answering Defendants admit the averments contained in Paragraph 2 of the Complaint.

3.      Plaintiffs Dan Norberg and Susan Norberg ("Plaintiffs") were appointed as co-trustees for Nick's next of kin on May 25, 2023, by the Honorable Shan C. Wang in Case No. 73-cv-23-1552 (Stearns. Dist. Ct.).

**ANSWER:**   Upon information and belief, the Defendants admit the averments contained in Paragraph 3 of the Complaint.

4.      Dan is Nick's father and Susan is the mother of Nick's children.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 4 of the Complaint.

5.      Defendant CentraCare Health System ("CC System") is a Minnesota nonprofit corporation with its registered office and principal place of business located at 1406 Sixth Avenue North, St. Cloud, MN 56303. CC System is a comprehensive,

2

integrated healthcare network that provides a wide range of medical services. CC System operates physical locations, including the Saint Cloud Hospital.

**ANSWER:**   Paragraph 5 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint.

6.      Defendant The Saint Cloud Hospital is a Minnesota nonprofit corporation with its registered office and principal place of business located at 1406 Sixth Avenue North, St. Cloud, MN 56303. The Saint Cloud Hospital is fully owned and operated by CC System and does business under the assumed name St. Cloud Hospital.

**ANSWER:**   Paragraph 6 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint.

7.      CC System and The Saint Cloud Hospital both do business under the assumed name CentraCare – St. Cloud Hospital ("CC Hospital").

**ANSWER:**   Paragraph 7 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint.

8.      Defendant CentraCare Clinic ("CC Clinic") is a Minnesota nonprofit

corporation with its registered office and principal place of business located at 1200 N. Sixth Avenue, St. Cloud, MN 56303. CC Clinic is fully owned and operated by CC System.

**ANSWER:**   Paragraph 8 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, upon information and belief, the Defendants admit the allegations contained in Paragraph 8 of the Complaint.

9.   Defendant Stearns County, Minnesota ("County") is a county within and a political subdivision of the State of Minnesota.  It is a body politic and corporate subject to suit pursuant to Minn. Stat. § 373.01 *et seq.*  The County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.*  The County owns and operates the Stearns County Jail ("Jail").

**ANSWER:**   Defendants admit the averments contained in Paragraph 9 of the Complaint.

10.   Effective December 17, 2019, CC Clinic and the County entered into an agreement entitled "Agreement for Jail Clinical Services 2020 through 2023" ("Agreement") whereby CC Clinic agreed to provide the County's constitutionally mandated health and medical services to detainees and inmates at the Jail.

**ANSWER:**   The Defendants admit the allegations contained in Paragraph 10 of the Complaint.

11.   CC Clinic operates under color of law for purposes of 42 U.S.C. § 1983 ("Section 1983"), as do its employees and the employees of CC System that provide medical services to detainees under the terms of the Agreement.

**ANSWER:**   Paragraph 11 is not directed to these Answering Defendants and contains

4

legal conclusions, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Complaint.

12.     At all relevant times, Defendant Daniel Gregory Falvey, M.D. ("Dr. Falvey") resided in Minnesota and was employed by CC System and/or The Saint Cloud Hospital.  In the alternative, he worked with apparent agency on behalf of the CC System and/or The Saint Cloud Hospital.

**ANSWER:**   Paragraph 12 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the Complaint.

13.     At all relevant times, Defendant Catherine Standfuss, APRN, CNP ("N.P. Standfuss") resided in Minnesota and was a Nurse Practitioner, working within the course and scope of her employment with CC System and/or CC Clinic.  In the alternative, N.P. Standfuss worked with apparent agency on behalf of CC System and/or CC Clinic.  With respect to the Section 1983 claim against her, N.P. Standfuss acted under color of state law and is sued in her individual capacity.

**ANSWER:**    Paragraph 13 is not directed to these Answering Defendants and contains legal conclusions, therefore, no response is necessary. To the extent a response may be required, Defendants admit that, upon information and belief, Defendant Standfuss was a Nurse Practitioner, but lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations contained in Paragraph 13 of the Complaint.

14.     At all relevant times, the County owed Nick and other Jail detainees a nondelegable duty of care to ensure that they received legally sufficient medical care.

**ANSWER:**     Paragraph 14 is a legal conclusion to which no response is necessary, but to the extent that an answer may be required, Defendants admit that Paragraph 14 of Plaintiff's Complaint is a generally accurate statement of the law, but deny that they have deprived Nick or the Plaintiffs of their rights.

15.     At all relevant times, Defendant Steven Polack ("Sgt. Polack") resided in Minnesota, was a sergeant at the Jail, was employed by the County, and acted under color of state law.  Sgt. Polack is sued in his individual capacity.

**ANSWER:**     Defendants admit that, at all relevant times, Sergeat Steven Polack resided in Minnesota, was a sergeant at the Stearns County Jail, and was employed by Stearns County. The remaining allegations contained in Paragraph 15 are legal conclusions to which no response is necessary, but to the extent that an answer may be required, the allegations are denied.

16.     At all relevant times, Defendant Makayla Epple ("C.O. Epple") was a correctional officer ("C.O.") at the Jail, was employed by the County, and acted under color of state law.  C.O. Epple is sued in her individual capacity.

**ANSWER:**     Defendants admit that, at all relevant times, Corrections Officer Makayla Epple was a correctional officer at the Stearns County Jail, and was employed by Stearns County. The remaining allegations contained in Paragraph 16 are legal conclusions to

which no response is necessary, but to the extent that an answer may be required, the allegations are denied.

17.     At all relevant times, Defendant Micah Theis ("C.O. Theis") was a C.O. at the Jail, was employed by the County, and acted under color of state law. C.O. Theis is sued in his individual capacity.

**ANSWER:**   Defendants admit that, at all relevant times, Corrections Officer Micah Theis was a Corrections Officer II at the Stearns County Jail and was employed by Stearns County. The remaining allegations contained in Paragraph 17 are legal conclusions to which no response is necessary, but to the extent that an answer may be required, the allegations are denied.

### Jurisdiction and Venue

18.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3). The aforementioned statutory and constitutional provisions confer original jurisdiction over this action. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**   Paragraph 18 of the Complaint consists of legal conclusions, therefore, no response is necessary. To the extent a response may be required, Defendants admit that the United States District Court for the District of Minnesota has jurisdiction over the federal claims brought by Plaintiff's Complaint. Defendants deny the remaining allegations contained in Paragraph 18 of the Complaint.

19.     Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota. Moreover, upon information and belief, all parties reside in this Judicial District.

**ANSWER:**   Paragraph 19 of the Complaint consists of legal conclusions, therefore, no response is necessary. To the extent a response may be required, Defendants admit that the United States District Court for the District of Minnesota is the proper venue for this matter.

## Factual Background

**A.     Overview of inhalant abuse and relevant medical principles**

20.     Inhalant abuse or "huffing" refers to the act of inhaling chemical vapors from household or commercial products for the purpose of achieving a psychoactive or mind-altering effect.

**ANSWER:**   Paragraph 20 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint and, therefore, must deny them.

21.     Products commonly abused in huffing include solvents, aerosols, gases, and nitrites, which can be found in spray paints, deodorants, hair sprays, whipped cream dispensers, paint thinners, and cleaning products (e.g. dust removal products).  These products contain ingredients like aromatic hydrocarbons, nitrous oxide, and volatile alkyl nitrites.

**ANSWER:**   Paragraph 21 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint and, therefore, must deny them.

22.     A person may engage in huffing by inhaling these volatile substances, which rapidly enter the bloodstream through the lungs, reach the brain, and cause an immediate and short-lived high.

**ANSWER:**    Paragraph 22 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint and, therefore, must deny them.

23.     Huffing is particularly addictive due to the rapid onset and brief duration of its effects, prompting repeated use. This pattern can lead to physical dependence and a compulsive need to continue using the substances despite harmful consequences.

**ANSWER:**    Paragraph 23 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint and, therefore, must deny them.

24.     Due to the accessibility of the products, huffing is disturbingly common. National surveys have reported that nearly 21.7 million Americans aged 12 and older have used inhalants at least once in their lives. *See* Cao S A, Ray M, Klebanov N, "Air  Duster Duster Inhalant Abuse Causing Non-ST Elevation Myocardial Infarction," <u>Cureus</u> 12(6)

(June 1, 2020).

**ANSWER:**    Paragraph 24 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint and, therefore, must deny them.

25.    The consequences of huffing are severe and can include both acute and chronic health issues. Acute effects can range from muscle weakness, vomiting, heart palpitations, and difficulty breathing, to more severe outcomes such as asphyxiation or "sudden sniffing death syndrome," which occurs when the user's body goes into cardiac arrest or other cardiac dysfunction following inhalation.

**ANSWER:**    Paragraph 25 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint and, therefore, must deny them.

26.    Chronic inhalant abuse can cause lasting damage to vital organs, including the brain, liver, lungs, heart, and kidneys, and makes the user susceptible to lethal organ failure.

**ANSWER:**    Paragraph 26 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint and, therefore, must deny them.

10

27.     The chemicals involved in huffing can have a variety of effects on the body, including the suppression of the body's natural ability to retain fluids.

**ANSWER:**     Paragraph 27 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint and, therefore, must deny them.

28.     Additionally, the physical symptoms associated with huffing, such as vomiting, rapid heartbeat, and hyperventilation, can further contribute to fluid loss thereby causing severe dehydration if left unattended.

**ANSWER:**     Paragraph 28 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and, therefore, must deny them.

29.     Increased heart rate and low blood pressure are symptoms of severe dehydration.

**ANSWER:**     Paragraph 29 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and, therefore, must deny them.

30.     Severe dehydration can lead to sudden cardiac arrest.

**ANSWER:**     Paragraph 30 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and, therefore, must deny them.

31.     Huffing can have dangerous anesthetic effects on the body, impacting the central nervous system, respiratory system, cardiovascular system, and creating cognitive impairments.

**ANSWER:**     Paragraph 31 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint and, therefore, must deny them.

32.     Huffing can cause temporary vision loss, create irregular heart rhythms, and lead to sudden cardiac arrest.

**ANSWER:**     Paragraph 32 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and, therefore, must deny them.

33.     The standard of care for treating inhalant abuse begins by addressing any life-threatening conditions such as cardiac arrhythmias, lack of oxygenation, and respiratory issues.

**ANSWER:**     Paragraph 33 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint and, therefore, must deny them.

34.     For a patient with a history of huffing who presents with signs of respiratory distress or cardiovascular issues, the standard of care requires providing respiratory support (supplemental oxygen, mechanical ventilation, etc.), taking a blood draw for toxicology, administering mediations to stabilize heart rate, and vigilant cardiovascular monitoring.

**ANSWER:**   Paragraph 34 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 of the Complaint and, therefore, must deny them.

35.     Given that inhalants can cause tachycardia (rapid heart rate), hypertension, cardiac arrythmia, asphyxia, hypoxia, and other acute cardiovascular and respiratory complications, the standard of care requires continuous monitoring of vital signs, including heart rate, blood pressure, respiratory rate, and oxygen saturation.

**ANSWER:**   Paragraph 35 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 of the Complaint and, therefore, must deny them.

36.     Regardless of a person's history of huffing, respiratory distress and cardiac arrythmias are serious medical conditions that can be fatal.

**ANSWER:**   Paragraph 36 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the Complaint and, therefore, must deny them.

37.     Regardless of a person's history of huffing, the medical standard of care requires, and common sense instructs, that one should not exacerbate respiratory distress by undermining the person's ability to breathe by restraining them in a way that would limit chest expansion and diaphragmatic movement, restrict lung capacity, intensify stress and anxiety, or cause positional asphyxia—a condition where the position of a person's body interferes with respiration, leading to suffocation.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding medical standards of care. Defendants deny the remaining allegations contained in Paragraph 37 of the Complaint.

38.     Handcuffing someone behind their back limits their chest expansion, restricts their lung capacity, intensifies their stress and anxiety, and can cause positional asphyxia.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 38 of the Complaint.

39.     Any layperson would recognize that someone in respiratory distress should not have their hands cuffed behind their back.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40.     Regardless of a person's history of huffing, the medical standard of care

requires, and common sense instructs, that one should not exacerbate cardiovascular distress by placing the person in a position that impairs their circulation, restricts their breathing, intensifies their stress and anxiety, or induces positional asphyxia.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations regarding medical standards of care, but deny the remaining allegations contained in Paragraph 40 of the Complaint

41.     Handcuffing someone behind their back impairs their circulation, places them in a position that impedes blood flow and venous return to the heart, restricts their chest expansion and diaphragmatic movement thereby their breathing, intensifies their stress and anxiety, and can induce positional asphyxia.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 41 of the Complaint.

42.     Any layperson would realize that someone in cardiovascular distress should not have their hands cuffed behind their back.

**ANSWER:**   Defendants deny the allegation contained in Paragraph 42 of the Complaint.

43.     When someone is complaining of respiratory or cardiovascular symptoms, the medical standard of care requires that one should not make the person struggle to receive a symptom-relieving medication or care because the struggle can exacerbate the symptoms.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 of the Complaint,

and, therefore, must deny them.

**B.       From September 16 – 18, 2022, Nick was admitted to the St. Cloud Hospital.**

**ANSWER:**     Paragraph B is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation contained in Paragraph B of the Complaint, and, therefore, must deny it.

44.     Nick previously sustained a traumatic brain injury ("TBI") in a severe vehicle accident.

**ANSWER:**   Paragraph 44 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 of the Complaint and, therefore, must deny them

45.     For years after the accident, Nick struggled with symptoms from the TBI, including severe depression and self-medication through substance use.

**ANSWER:**   Paragraph 45 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 of the Complaint and, therefore, must deny them.

46.     Despite maintaining sobriety for several months in 2022, Nick relapsed in September 2022 and became homeless.

**ANSWER:**     Paragraph 46 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 of the Complaint and, therefore, must deny them.

47.     On September 16, 2022, Nick presented to the CC Hospital Emergency Department ("CC Hospital ED") after consuming vodka, inhalants, and experiencing suicidal ideations.

**ANSWER:**     Paragraph 47 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 of the Complaint and, therefore, must deny them.

48.     The CC Hospital ED is part of the CC System.

**ANSWER:**     Paragraph 48 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 of the Complaint and, therefore, must deny them.

49.     Nick also disclosed a history of inhalant abuse.

**ANSWER:**     Paragraph 49 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of the Complaint and, therefore, must deny them.

50.     Nick was admitted into CC's Emergency Psychiatric Assessment,

Treatment and Healing Unit (the "EmPATH Unit"), where he was observed and treated for drug and alcohol withdrawal.

**ANSWER:**    Paragraph 50 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 of the Complaint and, therefore, must deny them.

51.    On September 17, 2022, Nick underwent an Electrocardiogram (ECG), which revealed a "borderline" result (i.e., unclear result), presumably due to a finding of an incomplete right bundle branch block (IRBBB) in the heart.

**ANSWER:**    Paragraph 51 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51 of the Complaint and, therefore, must deny them.

52.    Generally, an IRBBB reflects a delay in the electrical conduction through the right bundle branch of the heart's conduction system.  This can be caused by underlying heart conditions or other health issues and requires follow-up treatment or monitoring.

**ANSWER:**    Paragraph 152 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52 of the Complaint and, therefore, must deny them.

53.    The remaining findings on the September 17, 2022 ECG were generally

within normal limits, including the ventricular rate (i.e., heart rate) of 81 beats per minute (bpm).

**ANSWER:**   Paragraph 53 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53 of the Complaint and, therefore, must deny them.

54.   Despite that normal finding on the ECG, Nick was otherwise found to be persistently tachycardic and hypertensive during his hospitalization at the EmPath Unit.

**ANSWER:**   Paragraph 54 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54 of the Complaint and, therefore, must deny them.

55.   Neither Nick's heart rate nor blood pressure were controlled by the Ativan he received during his hospitalization.

**ANSWER:**   Paragraph 55 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55 of the Complaint and, therefore, must deny them.

56.   Nick was discharged on September 18, 2022, with an Assessment & Plan noting that follow-up was recommended for Nick's uncontrolled hypertension.

**ANSWER:**   Paragraph 56 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56 of the Complaint and, therefore, must deny them.

57.     Nick's circumstances, symptoms, and medical condition were documented by the CC System.

**ANSWER:**     Paragraph 57 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57 of the Complaint and, therefore, must deny them.

**C.     Nick was arrested on October 16, 2022, and transported to CC Hospital.**

**ANSWER:**   On information and belief, these Answering Defendants admit the allegations contained in Paragraph C of the Complaint.

58.     On October 16, 2022, Nick purchased twelve cans of an aerosol dust removal spray (or compressed gas duster) from a Walmart store located in St. Cloud.

**ANSWER:**     These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 of the Complaint and, therefore, must deny them.

59.     It was reported that Nick then spent three hours becoming intoxicated from the spray in a Walmart restroom.

**ANSWER:**     These Answering Defendants admit that they were informed that Nick had been found huffing inhalants in a Walmart restroom and became intoxicated. Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 59 of the Complaint and, therefore, must deny them.

60.     A Walmart employee called the St. Cloud Police Department to report Nick's conduct just before 7:00 p.m.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 60 of the Complaint and, therefore, must deny them.

61.     Shortly thereafter, St. Cloud police officers responded to the scene and used force on the intoxicated Nick.

**ANSWER:**   Upon information and belief, Defendants admit the allegations contained in Paragraph 61 of the Complaint.

62.     Nick was subjected to multiple Taser deployments.

**ANSWER:**   Upon information and belief, Defendants admit being informed that Nick was subjected to more than one Taser deployment. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 62 of the Complaint and, therefore, must deny them.

63.     Nick was ultimately arrested and charged with misdemeanor use of an intoxicating substance and obstruction of legal process.

**ANSWER:**   Upon information and belief, Defendants admit Nick was arrested by officers employed by the St. Cloud Police Department based on probable cause that Nick had committed misdemeanor offenses for using an intoxicating substance and obstruction

of legal process. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 63 of the Complaint and, therefore, must deny them.

64.     The time of arrest was noted as 7:11 p.m.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 64 of the Complaint and, therefore, must deny them.

65.     Officer John Dutke ("Officer Dutke"), Officer Zachary Scholl ("Officer Scholl"), and Officer Daniel Long ("Officer Long") transported Nick to the CC Hospital ED in Officer Long's squad car.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 of the Complaint and, therefore, must deny them.

66.     Nick's hands were cuffed behind his back throughout the transport.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66 of the Complaint and, therefore, must deny them.

67.     Nick audibly struggled to breathe and complained that he was having difficulty breathing, that he was dying, and that he could feel his heart "through [his] chest."

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 of the Complaint

and, therefore, must deny them.

68.     Nick's time at the CC Hospital ED ("ED Visit") was recorded on several body worn cameras ("BWC"), though officers did shut off the audio of their BWCs for prolonged periods of time.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 of the Complaint and, therefore, must deny them.

69.     The BWC videos are incorporated herein by reference.

**ANSWER:**   No response is necessary to Paragraph 69 of the Complaint.

70.     The BWC videos contain redactions that are believed to have been made by one or more of the law enforcement agencies prior to providing those videos to Plaintiffs.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 of the Complaint and, therefore, must deny them.

71.     At 7:32 p.m., while still seated in Officer Long's squad car now parked in the hospital's ambulance garage, Nick stated, "Oh my god. It's a heart attack," and begged for water.

**ANSWER:**   These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 of the Complaint and, therefore, must deny them.

72.     Officers Dutke, Scholl, and Long placed Nick in a wheelchair, his hands

cuffed behind his back, and transported him to a hospital room.

**ANSWER:**    These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 of the Complaint and, therefore, must deny them.

73.    At 7:36 p.m., the three officers, a CC Hospital ED security guard, Nurse Amina Abdi, and other CC Hospital ED staff members were present in the room when Nick begged for water and stated he was having a heart attack.

**ANSWER:**   Paragraph 73 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 of the Complaint and, therefore, must deny them.

74.    Hunched over in his wheelchair with his hands cuffed behind him, Nick states, "I would never harm you guys."

**ANSWER:**    Paragraph 74 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 of the Complaint and, therefore, must deny them.

75.    Dr. Falvey entered Nick's room at 7:37 p.m., at which point Nick repeatedly said, "I can't breathe, I can't breathe," and again begged for water.

**ANSWER:**    Paragraph 75 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 of the Complaint and, therefore, must deny them.

76.     Dr. Falvey knew the information outlined in Paragraphs 20 – 43 from his professional training.

**ANSWER:**     Paragraph 76 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76 of the Complaint and, therefore, must deny them.

77.     The officers explained to Dr. Falvey that Nick had been huffing.

**ANSWER:**     Paragraph 77 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 of the Complaint and, therefore, must deny them.

78.     At 7:39 p.m., Dr. Falvey watched as Nick stated, "I can't breathe, I can't move, I'm going to die."

**ANSWER:**     Paragraph 78 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 of the Complaint and, therefore, must deny them.

79.     Nick was still handcuffed behind his back and seated in a wheelchair.

**ANSWER:**     Paragraph 79 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 of the Complaint and, therefore, must deny them.

80.    A nurse asked Dr. Falvey "Can I give him water?"

**ANSWER:**    Paragraph 80 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 of the Complaint and, therefore, must deny them.

81.    Dr. Falvey responded, "as long as he participates."

**ANSWER:**    Paragraph 81 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 of the Complaint and, therefore, must deny them.

82.    An image taken from one of the BWC recordings from this time is below:



**ANSWER:**   Paragraph 82 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 of the Complaint and, therefore, must deny them.

83.     Dr. Falvey ordered an X-ray and ECG, then left at 7:40 p.m.

**ANSWER:**   Paragraph 83 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 of the Complaint and, therefore, must deny them.

84.     Dr. Falvey charted receiving the following medical history from Norberg and law enforcement: "Nickolas D Norberg 37 Y male with a history of polysubstance dependence and hypertension who presents to the ED for evaluation of jail clearance. Police report patient was found naked and confused in Walmart bathroom stall huffing 4-6 cans of air duster this evening.  Patient was uncooperative and became aggressive per police so he was tazed twice.  They are requesting medical clearance in order to transport the patient to jail. **Patient complains of difficulty breathing at this time.**  He offers no history aside from admitting to spilling chemicals on his chest.  Patient would not specify when and did not offer any further information." (Emphasis added.)

**ANSWER:**   Paragraph 84 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 84 of the Complaint and, therefore, must deny them.

85.     Dr. Falvey did not chart that Nick had repeatedly begged for water.

**ANSWER:**     Paragraph 85 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85 of the Complaint and, therefore, must deny them.

86.     The ECG was performed at 7:40 p.m., at which time it was determined that Nick had an "Abnormal ECG."

**ANSWER:**     Paragraph 86 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 of the Complaint and, therefore, must deny them.

87.     The ECG was abnormal in many respects both individually and compared to Nick's September 17, 2022, including:

a.     A heart rate 156 bpm, which is tachycardic (for an adult, any reading over 100 bpm is considered tachycardic);

b.     Significant increase in heart rate by 75 bpm from September 17, 2022;

c.     Presence of sinus tachycardia;

d.     Prolonged QTc Interval of 483 ms;

e.     Nonspecific ST abnormality; and

f.     ST now depressed in inferior leads.

**ANSWER:** Paragraph 87 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 of the Complaint and, therefore, must deny them.

88.     In fact, Dr. Falvey found Nick's heart rate to be even higher than 156 bpm, in the "high 160s," though the exact reading was not specifically charted.

**ANSWER:** Paragraph 88 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 of the Complaint and, therefore, must deny them.

89.     The finding of an ST segment depression in the inferior leads, particularly given Nick's history of inhalant abuse and subjected Taser usage, was highly concerning for serious and life-threatening cardiac complications.

**ANSWER:** Paragraph 89 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89 of the Complaint and, therefore, must deny them.

90.     Yet, Dr. Falvey failed to order a complete cardiac workup.

**ANSWER:** Paragraph 90 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 90 of the Complaint and, therefore, must deny them.

91.     Dr. Falvey's failure to order a complete cardiac workup after learning of Nick's condition was in violation of the standard of care.

**ANSWER:**     Paragraph 91 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91 of the Complaint and, therefore, must deny them.

92.     An x-ray was also performed on Nick.

**ANSWER:**     Paragraph 92 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92 of the Complaint and, therefore, must deny them.

93.     Dr. Falvey claimed the x-ray revealed no concerning findings.

**ANSWER:**   Paragraph 93 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 of the Complaint and, therefore, must deny them.

94.     The x-ray provided only limited insight into Nick's urgent medical condition and was not a basis to ignore the rest of Nick's highly concerning clinical picture.

**ANSWER:**     Paragraph 94 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94 of the Complaint and, therefore, must deny them.

95.     Dr. Falvey conducted no other diagnostic tests of Nick, such as drawing blood.

**ANSWER:**   Paragraph 95 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95 of the Complaint and, therefore, must deny them.

96.     Inexplicable discrepancies exist between the BWC footage and the chart notes.

**ANSWER:**   Paragraph 96 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 of the Complaint and, therefore, must deny them.

97.     For instance, at 7:41 p.m., Officer Scholl's BWC shows Nick rocking back and forth gasping for air, but the chart note indicates Nick is "alert and oriented, talking in full sentences."

**ANSWER:**   Paragraph 97 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 of the Complaint and, therefore, must deny them.

98.     The chart notes also stated the Police Department was "requesting medical clearance at this time."

**ANSWER:**   Paragraph 98 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 of the Complaint and, therefore, must deny them.

99.     Nick was never alert or oriented.

**ANSWER:**   Paragraph 99 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 of the Complaint and, therefore, must deny them.

100.     Nick was barely coherent and demonstrated limited control over his mental and physical faculties throughout the entirety of the ED Visit.

**ANSWER:**    Paragraph 100 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 100 of the Complaint and, therefore, must deny them.

101.     At 7:46 p.m., Nick continued struggling to breathe with his hands cuffed behind his back.

**ANSWER:**    Paragraph 101 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 of the Complaint and, therefore, must deny them.

102.    Nurse Amina Abdi, another unidentified CC Hospital ED staff person, and Officers Scholl and Dutke were present in the room.

**ANSWER:**    Paragraph 102 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 of the Complaint and, therefore, must deny them.

103.    Nick looked at Officer Scholl and said, "Sir, this is extreme torture [inaudible] I can't breathe, I can't breathe."

**ANSWER:**    Paragraph 103 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 of the Complaint and, therefore, must deny them.

104.    As charted, Nick's pulse was taken at 7:48 p.m. at a rate of 110 bpm, which again reflected that Nick was tachycardic.

**ANSWER:**    Paragraph 104 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 104 of the Complaint and, therefore, must deny them.

105.    Shockingly, while Nick is visibly gasping for air and unable to sit up in his

wheelchair, the provider notes describe Nick as "Awake and alert. Normal speech … No respiratory distress."



**ANSWER:** Paragraph 105 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 105 of the Complaint and, therefore, must deny them.

106.    Approximately 20 minutes later, Nick was still unable to catch his breath and slumped onto the ground with his hands still cuffed behind him.

**ANSWER:** Paragraph 106 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 of the Complaint and, therefore, must deny them.

107.    Nick's arms caught on the wheelchair handrails and the officers and CC

System staff watched as Nick struggled.





**ANSWER:**     Paragraph 107 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 107 of the Complaint and, therefore, must deny them.

108.     In the following minutes, Officers and Nurses forced Nick back into the

wheelchair, where he was left struggling to breathe, rocking back and forth, presumably trying to expand his diaphragm.

**ANSWER:**    Paragraph 108 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 of the Complaint and, therefore, must deny them.

109.    Just before 8:30 p.m., Nick again slumped onto the hospital room floor with his hands still cuffed behind his back.

**ANSWER:**    Paragraph 109 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 of the Complaint and, therefore, must deny them.

110.    Nick was writhing on the hospital floor with his hands still cuffed behind him and was audibly wheezing.

**ANSWER:**    Paragraph 110 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 of the Complaint and, therefore, must deny them.

111.    Nurse Amina Abdi entered the room and Nick again states, "I can't breathe."

**ANSWER:**    Paragraph 111 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 of the Complaint and, therefore, must deny them.

112.    Minutes later, Nurse Amina Abdi placed a pulse monitor on Nick's toe.

**ANSWER:**    Paragraph 112 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112 of the Complaint and, therefore, must deny them.

113.    Dr. Falvey entered the room at 8:34 p.m.

**ANSWER:**    Paragraph 113 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 113 of the Complaint and, therefore, must deny them.

114.    Dr. Falvey did not touch Nick, speak to Nick, conduct any examination of Nick, or take any of Nick's vitals.

**ANSWER:**    Paragraph 114 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 of the Complaint and, therefore, must deny them.

115.    Dr. Falvey watched Nick writhing on the floor in handcuffs, talked with Nurse Amina Abdi, checked his phone, and then left two minutes after entering the room.









**ANSWER:**    Paragraph 115 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 115 of the Complaint and, therefore, must deny them.

116.    Nurse Amina Abdi and another CC Hospital staff member attempted to take Nick's vitals as he laid on the floor handcuffed.

**ANSWER:**    Paragraph 116 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 of the Complaint and, therefore, must deny them.

117.    Nick's pulse was measured between 85 and 110 bpm and his respiratory rate was measured at 28 breaths per minute.

**ANSWER:**    Paragraph 117 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 of the Complaint and, therefore, must deny them.

118.    At 8:50 p.m., Officers Dutke and Scholl picked Nick up off the ground, placed him in the wheelchair, and wheeled him outside to Officer Dutke's squad car.

**ANSWER:**    Paragraph 118 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 of the Complaint and, therefore, must deny them.

119.    Nick was visibly gasping for air, sweating, and drooling.

**ANSWER:**    Paragraph 119 is not directed to these Answering Defendants and, therefore,

no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 of the Complaint and, therefore, must deny them.

120.     Nick was handcuffed for the entirety of his 80-minute ED Visit and during the time when his vitals were checked.

**ANSWER:**     Paragraph 120 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 of the Complaint and, therefore, must deny them.

121.     The vital signs of a person with his hands cuffed behind his back can skew the readings.

**ANSWER:**     Paragraph 121 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants deny the allegations contained in Paragraph 121 of the Complaint.

122.     Nick's clinical picture, including his medical history, vitals, and ECG, reflected that he was at a high risk for cardiac dysfunction that could result in death.

**ANSWER:**     Paragraph 122 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 122 of the Complaint and, therefore, must deny them.

123.     Any layperson watching or listening to Nick would have observed that he

was in severe respiratory distress.

**ANSWER:**   Paragraph 123 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 of the Complaint and, therefore, must deny them.

124.   Dr. Falvey provided no treatment to mitigate the risk of cardiac dysfunction to Nick.

**ANSWER:**   Paragraph 124 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 of the Complaint and, therefore, must deny them.

125.   Dr. Falvey spent a total of five minutes in the same room with Nick.

**ANSWER:**   Paragraph 125 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 of the Complaint and, therefore, must deny them.

126.   Dr. Falvey never touched Nick, nor spoke to Nick directly.

**ANSWER:**   Paragraph 126 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 126 of the Complaint and, therefore, must deny them.

127.    Dr. Falvey violated the medical standard of care when he discharged Nick at 8:53 p.m. to the Stearns County Jail without further workup, monitoring, or treatment of Nick, despite knowing that Nick had recently huffed, was suffering from severe respiratory distress, that his heart rate "increased BY 75 BPM" since his September 17, 2022 visit, and that he was then presenting with an "[a]bnormal ECG."

**ANSWER:**    Paragraph 127 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 of the Complaint and, therefore, must deny them.

128.    This discharge of Nick exhibited a particular and deliberate disregard for the high probability of harm to Nick, particularly because:

      a.    this discharge was made a little over one hour after Nick arrived at the CC Hospital ED;

      b.    Nick's highly concerning symptoms never resolved;

      c.    Dr. Falvey knew that Nick was being discharged to Jail, where it was unlikely that Nick would receive the same level of medical monitoring and care that he would receive in a medical setting; and

      d.    when in Jail, Nick was not free to leave to obtain his own medical care.

**ANSWER:**    Paragraph 128 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 128 of the Complaint and, therefore, must deny them.

129.   The medical standard of care required that Dr. Falvey, at a minimum, keep Nick in the ED to further assess Nick through a complete cardiology workup, blood analysis, and continued observation of Nick's vitals.

**ANSWER:**   Paragraph 129 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 129 of the Complaint and, therefore, must deny them.

130.   Had Dr. Falvey acted within the standard of care by further assessing Nick, more likely than not, the standard of care would have required that Nick be admitted into the hospital.

**ANSWER:**   Paragraph 130 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130 of the Complaint and, therefore, must deny them.

131.   Had Dr. Falvey provided Nick with treatment within the medical standard of care, more likely than not, Nick would not have died on October 17, 2022.

**ANSWER:**   Paragraph 131 is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, these Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 131 of the Complaint and, therefore, must deny them.

**D.     Jail Sgt. Polack and other Jail staff failed to fulfill mandated intake and screening obligations and booked Nick for detention with deliberate indifference to Nick's serious medical needs.**

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph D of the Complaint.

132.   Nick arrived at the Jail at approximately 9:00 p.m.

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 132 of the Complaint.

133.   Sgt. Polack and C.O. Epple met the St. Cloud police officers transporting Nick in the Jail's sallyport.

**ANSWER:**   These Answering Defendants admit the allegations contained Paragraph 133 of the Complaint.

134.   Sgt. Polack and C.O. Epple learned several pieces of information from the St. Cloud police officers, including that Nick was arrested while huffing multiple cans of inhalants, was tased multiple times, and that Nick had been released and cleared for incarceration by the CC Hospital ED.

**ANSWER:**   These Answering Defendants admit the allegations contained Paragraph 134 of the Complaint.

135.   Even though Sgt. Polack and C.O. Epple learned that Nick had been cleared by the CC Hospital ED, they received discharge paperwork from the hospital, which stated the following instruction for Nick: "Return to the ED if you develop new or worsening

symptoms."

**ANSWER:**   These Answering Defendants admit the allegations contained Paragraph 135 of the Complaint.

136.   Any layperson seeing Nick's condition—covered in sweat, wheezing, shaking, drooling, unable to speak in full or coherent sentences, and unable to stand on his own—would realize that Nick should be immediately returned to the ED.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 136 of the Complaint.

137.   While still seated and cuffed in Officer Dutke's squad car parked in the sallyport, Nick told C.O. Epple, through gasps for air, that he would cooperate.

**ANSWER:**   These Answering Defendants admit that Nick told Corrections Officer Epple that he intended to cooperate, but deny the remaining allegations contained in Paragraph 137 of the Complaint.

138.   Sgt. Polack and C.O. Epple observed that when Nick was removed from the back of the squad car, Nick "was unsteady on his feet and had difficult standing."

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 138 of the Complaint.

139. Nick practically had to be carried into the jail, with C.O. Eppel switching places with another officer midway due to Nick's inability to stand.



**ANSWER:** These Answering Defendants admit that Nick needed assistance walking into the jail, and that Corrections Officer Epple switched places with another officer at some point, but deny the remaining allegations contained in Paragraph 139 of the Complaint.

140. Unable to hold Nick upright, Nick was propped against the corner of the elevator.



**ANSWER:**    These Answering Defendants admit that Nick was leaned against the corner of the elevator, but deny the remaining allegations contained in Paragraph 140 of the Complaint.

141.    C.O. Epple informed Sgt. Polack that Nick "would comply with the intake process."

**ANSWER:**  These Answering Defendants admit the allegations contained in Paragraph 141 of the Complaint.

142.   Nick was booked and detained on charges of obstructing the legal process and using intoxicating substances.

**ANSWER:**    These Answering Defendant admit that Nick went through the intake process upon arriving at the jail, and admit that the charges identified by the arresting officers were obstructing legal process and using intoxicating substances, but deny the remaining allegations contained in Paragraph 142 of the Complaint.

143.    Despite learning that Nick would comply with the intake process, Sgt. Polack did not perform or require that any C.O. perform mandated medical screening or classification procedures prior to placing Nick in a cell.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 143 of the Complaint.

144.    Any layperson seeing Nick enter the Jail—covered in sweat, wheezing, shaking, drooling, unable to speak in full or coherent sentences, and unable to stand on his own—would realize that Nick should receive medical screening and immediate medical attention.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 144 of the Complaint.

145.    Instead, at Sgt. Polack's direction and with his approval, Nick was brought directly to his cell without these important intake and screening procedures.

**ANSWER:**   These Answering Defendants admit that Nick was taken directly to a cell so that the intake process could be performed safely, but deny the remaining allegations contained in Paragraph 145 of the Complaint.

146.    An Initial Classification Worksheet ("Worksheet"), which is required to be completed during the initial booking process, was completed at approximately 9:15 p.m. (10 minutes after Nick was left naked in his cell) by an unknown C.O.

**ANSWER:**   These Answering Defendants admit that an Initial Classification Worksheet was completed sometime around 9:15 p.m., but deny the remaining allegations contained

49

in Paragraph 146 of the Complaint.

147.     The Worksheet denoted that Nick was under the influence of drugs and falsely stated that the remainder of the Worksheet was not completed because Nick was "uncooperative" at intake:

### INITIAL CLASSIFICATION WORKSHEET

Name Norberg, Nickolas                Link # _____   Date 10-16-22  Time 2115
Charges Toxic Sub., obst.

**DETENTION INFORMATION**

_____ Booked and cited (to be released when sober or to responsible party)
___α__ Held for court appearance
_____ Held for pickup by another jurisdiction
Detainers: _____

Condition of entry:        _____ Reporting as per court commitment
                           ___α__ Delivered subsequent to arrest
                           _____ Other (explain) _____

Does the subject have physical restrictions or medical needs requiring special housing?
                           _____ No
                           _____ Yes (explain) _____

Is the subject:
Diabetic?                  No _____   Yes _____
Taking Medications?        No _____   Yes _____
Pregnant?                  No _____   Yes _____

                           Explanation _____

*Uncooperative Intake*

**BEHAVIOR OBSERVATIONS**
Has the subject expressed or indicated intent to harm themselves or others?
                           _____ No
                           _____ Yes (explain) _____

Is the subject cooperative?        _____ Yes    _____ No    *Hnff*

In your estimation, is the subject under the influence of alcohol/drugs?   _____ No   __X__ Yes

Subject's mood seems:      _____ Depressed (reserved, extremely quiet, crying, etc.)
                           _____ Excited (loud, aggressive, demanding, etc.)
                           _____ Mixed (explain)
                           _____ Unremarkable
                 Comments: _____

Watch status:              _____ Normal
                           _____ Special (explain plan)

Worksheet completed by _____ 2767
Shift supervisor's signature _____

**ANSWER:**     These Answering Defendants deny that the information in the Worksheet was false. For the remaining allegations contained in Paragraph 147, the document speaks

for itself and no response is necessary.

148.    Nick was cooperative.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 148 of the Complaint.

149.    After Nick's death, this was tacitly memorialized when Stearns County Sheriff's Lieutenant Boerger drafted a letter to Captain Maslonkowski on March 9, 2023 (i.e., five months after Nick's death), stating that "[t]he booking process for Inmate Nickolas Norberg (DOB: 1985█████ ) was not completed following intake on 10/16/22 **due to the belief** that he was under the influence and our staff could not ensure that we would receive accurate information." (Emphasis added.)

**ANSWER:**   The document referred to in Paragraph 149 speaks for itself and no response is necessary. To the extent a response may be required, the Defendants admit that Lieutenant Boerger drafted a letter to Captain Maslonkowki, and the Defendants admit that Paragraph 149 correctly quotes a portion of that letter.

150.    That this letter was pointedly drafted reflects that it was a specific area of concern for the Jail supervisors:



DATE:  March 9, 2023
  TO:  Captain Maslonkowski
FROM:  Lt. Boerger
  RE:  **Norberg, Nickolas (#151983)**

The booking process for Inmate Nickolas Norberg (DOB: 1985▮▮▮) was not completed following his intake on 10/16/2022 due to the belief that he was under the influence and our staff could not ensure that we would receive accurate information.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 150 of the Complaint.

151.    Any indication that Nick would not be able to provide accurate information was due to him suffering from objectively serious and obvious medical needs, such as being in serious cardiac and respiratory distress.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 151 of the Complaint.

152.    Thus, a proper intake of Nick was not performed on October 16, 2022, because Jail staff simply chose not to conduct a proper intake at Sgt. Polack's direction and/or with Sgt. Polack's approval.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 152 of the Complaint.

153.    Jail Policy 11.5 states, in relevant part, as follows:

11.5.0 POLICY: An initial medical screening **will be completed** for **all** inmates being booked for confinement and not released upon the completion of the booking process.  The screening tool

shall become a part of the inmate's medical record. All medical-screening tools shall be forwarded to and reviewed by nursing staff for follow up on medical or mental health concerns. The medical screening tool will include the required mental health screening per Minnesota Statute 641.15 sub 3 and 3a.

11.5.1 <u>Jail Staff</u>: The booking officer **will complete** a Medical Screening Admission Form for **all inmates** not released upon the completion of the booking process.

A. Inmates will be asked all medical questions in as private a manner as allowed by the physical plant in order to protect confidentiality. Procedure for answering questions on Medical Screening Form is to be followed. Staff will attempt to provide as much information as possible regarding the inmate.

B. If an inmate refuses to answer medical screening questions the inmate **will be referred** to the nursing staff for follow-up.

(Emphasis added.)

**ANSWER:** The document referred to in Paragraph 153 speaks for itself and no response is necessary. To the extent a response may be required, these Answering Defendants deny any implication that they did not follow any policies or procedures.

154. In violation of ministerial duties and with deliberate disregard for Nick's obvious and serious medical needs, Jail staff did not even attempt to perform the required medical screening and did not refer Nick to nursing staff for follow-up.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 154 of the Complaint.

155. This was done at Sgt. Polack's direction and/or with his approval.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph

155 of the Complaint.

156.    These policies were ignored even though Jail Policy 7.7 expressly acknowledges that "[m]ost jail incidents such as suicide, **medical**, and behavioral problems occur within the first 72 hours of incarceration."

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 156 of the Complaint.

157.    Had a proper intake and medical screening been performed on Nick on October 16, 2022, he would have been returned to the CC Hospital ED.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 157 of the Complaint.

158.    Had Nick been returned to the CC Hospital ED and had Nick received reasonable medical care, more likely than not Nick would not have died on October 17, 2022.

**ANSWER:**    These Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 158 of the Complaint, and, therefore, must deny them.

**E.    Upon placement in the cell, Nick immediately became increasingly ill and struggled to breathe.**

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph E of the Complaint.

159.    Rather than ensure Nick receive a proper screening and medical attention, Jail C.O.s brought Nick to a cell.

**ANSWER:**     These Answering Defendants admit that Nick was brought to a cell shortly after his arrival at the jail, but deny the remaining allegations contained in Paragraph 159 of the Complaint.

160.     Two officers stripped Nick naked, while another forcibly pushed Nick's face into the mattress and held it down as depicted below:



**ANSWER:**     These Answering Defendants admit that Nick's pants and sweatshirt were removed for safety reasons, since the pants had a drawstring and the sweatshirt had a zipper, but deny the remaining allegations contained in Paragraph 160 of the Complaint.

161.     Nick was subjected to this force even though he was in a vulnerable medical

condition, indicated he would cooperate, and was not resisting.

**ANSWER:**   These Answering Defendants admit that Nick indicated to Corrections Officer Epple that he intended to cooperate, and that he was not actively resisting, but deny that they used anything other than reasonable restraint under the circumstances for the safety of all concerned. Defendants deny the remaining allegations contained in Paragraph 161 of the Complaint.

162.   This was all done at Sgt. Polack's direction and/or with his approval.

**ANSWER:**  These Answering Defendants admit that Sergeant Polack was present in Nick's cell, but deny the remaining allegations contained in Paragraph 162 of the Complaint.

163.   Minnesota Department of Corrections ("DOC") regulations and Jail policy require that Jail staff conduct staggered well-being checks on inmates every 30 minutes.

**ANSWER:**   The Minnesota Department of Corrections regulations and Jail policies speak for themselves, and no response is necessary to Paragraph 163 of the Complaint. These Answering Defendants admit the allegations contained in Paragraph 163 of the Complaint.

164.   Well-being checks must be conducted with such sufficiency and diligence that the C.O.s conducting the check confirms, among other things, that an inmate is alive and not in medical distress.

**ANSWER:**   Because Paragraph 164 consists of a legal conclusion and Minnesota Administrative Rule 2911.5000 speaks for itself, no response is necessary to Paragraph 164 of the Complaint. To the extent a response may be required, Defendants deny the

implication that their well-being checks were not sufficient according to law and policy.

165.    Well-being checks must be completed slowly and deliberately enough to confirm that the inmate is alive and well.

**ANSWER:**   Because Paragraph 165 consists of a legal conclusion and Minnesota Administrative Rule 2911.5000 speaks for itself, no response is necessary to Paragraph 165 of the Complaint. To the extent a response may be required, Defendants deny the implication that their well-being checks were not sufficient according to law and policy.

166.    Well-being checks are not adequate if the C.O. checks merely that there is a human body in the cell.

**ANSWER:**   Because Paragraph 166 consists of a legal conclusion and Minnesota Administrative Rule 2911.5000 speaks for itself, no response is necessary to Paragraph 166 of the Complaint. To the extent a response may be required, Defendants deny the implication that their well-being checks were not sufficient according to law and policy.

167.    Inmates may be subjected to shorter and more intensive well-being checks if certain conditions exist, such as medical concerns that may be observed during medical screening or recent Taser usage.

**ANSWER:**   Because Paragraph 167 consists of a legal conclusion and Minnesota Administrative Rule 2911.5000 speaks for itself, no response is necessary to Paragraph 167 of the Complaint. To the extent a response may be required, Defendants deny the implication that their well-being checks were not sufficient according to law and policy.

168.    Since Nick was subjected to Taser deployments before he entered the Jail,

Jail staff initiated a "Taser watch," requiring that well-being checks be conducted on Nick every 10 minutes.

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 168 of the Complaint.

169.   Nick was left naked in the cell at around 9:05 p.m.

**ANSWER:**   These Answering Defendants admit that, at about 9:05 p.m., Nick was temporarily left without the clothing he wore when entering the jail while staff retrieved jail clothing for him.

170.   Shortly after the C.O.s left, Nick struggled to breathe and repeatedly vomited.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 170 of the Complaint.

171.   At 9:10 p.m. the C.O.s slid a Jail uniform into Nick's cell, at which point C.O. Theis observed Nick struggling to drink out of the sink before collapsing on the mattress.

**ANSWER:**   These Answering Defendants admit that Nick was given a blanket immediately, and, approximately two minutes later, a corrections officer brought Nick jail clothing, but deny the remaining allegations contained in Paragraph 171 of the Complaint.

172.   Due to his objectively serious and obvious medical needs, Nick did not even have the cognitive or physical ability to put his uniform on and was forced to crawl, flop, and lie naked in his cell until his death.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 172 of the Complaint.

173.    At 9:20 p.m., Nick appeared to be talking to Sgt. Polack.  It is unclear what was said but Nick crawled to the bench, maintained the conversation for a few seconds, then collapsed again onto the mattress.

**ANSWER:**    These Answering Defendants admit that Sergeant Polack checked on Nick a few minutes before 9:20 p.m., that Nick moved from laying on the mattress to sitting on the bench, that Sergeant Polack conversed with Nick, and that Nick returned to the mattress after speaking with Polack, but deny the remaining allegations contained in Paragraph 173 of the Complaint.

174.    Sgt. Polack watched from the door.

**ANSWER:**    These Answering Defendants admit that Sergeant Polack checked on Nick from the door, but deny the implication that he observed Nick "collapse[ing]" or experiencing new symptoms that were not present when he arrived at the jail after being discharged and determined fit for confinement by medical professionals.

175.    At approximately 9:30 p.m., Sgt. Polack, checked on Nick.  Nick told Sgt. Polack he was having difficulty breathing and Sgt. Polack observed Nick struggling to breathe.

**ANSWER:**    These Answering Defendants admit that Sergeat Polack checked on Nick at approximately 9:25 p.m. and that Nick reported having difficulty breathing, but deny the remaining allegations contained in Paragraph 175 of the Complaint.

176.    Sgt. Polack also observed Nick's face turning blue and purple.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 176 of the Complaint.

177.    Sgt. Polack and C.O. Theis attempted to obtain Nick's vitals.  Nick was still naked on the bed, so C.O. Theis draped Nick's Jail shirt over Nick's groin.

**ANSWER:**   These Answering Defendants admit that Sergeant Polack attempted to obtain Nick's vital signs, and that a jail shirt was draped over Nick, but deny the remaining allegations contained in Paragraph 177 of the Complaint.

178.    C.O. Eppel entered the room to see Nick's vitals being taken and observed Nick's condition.



**ANSWER:**   These Answering Defendants admit that Corrections Officer Epple was present for at least part of the time that Nick's vital signs were being taken, but deny the

remaining allegations contained in Paragraph 178 of the Complaint.

179.    Nick was in so much distress he was unable to sit up for longer than a few minutes and collapsed in front of C.O.s Theis, Eppel, and Sgt. Polack.

**ANSWER:**    These Answering Defendants admit that Nick was sitting for part of the time during which his vital signs were taken, but deny the remaining allegations contained in Paragraph 179 of the Complaint.

180.    Because of Nick's difficulty breathing, Sgt. Polack and C.O. Theis could not get a blood pressure reading.

**ANSWER:**    These Answering Defendants admit that Sergeant Polack was unable to obtain Nick's blood pressure because he kept moving, but deny the remaining allegations contained in Paragraph 180 of the Complaint.

181.    Nick was cooperative while Sgt. Polack attempted to collect his vitals.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 181 of the Complaint.

182.    Sgt. Polack and the other C.O. did obtain Nick's pulse rate of 135 to 147 beats per minute, reflecting that Nick's persistent tachycardia was continuing.

**ANSWER:**    These Answering Defendants admit that Segeant Polack and the other corrections officer obtained Nick's pulse rate and measured it at 135 to 147 beats per minute, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 182 of the Complaint.

183.    Any layperson observing Nick at this point would understand that he needed

medical intervention to save his life.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 183 of the Complaint.

**F.     N.P. Standfuss acted with deliberate disregard toward Nick's objectively serious and obvious medical needs and violated the medical standard of care.**

**ANSWER:**   Paragraph F of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph F of the Complaint.

184.   At approximately 9:35 p.m., Sgt. Polack called the on-call medical provider, who was CC Clinic N.P. Standfuss.

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 184 of the Complaint.

185.   N.P. Standfuss knew from her professional training of the information outlined in Paragraphs 20-36.

**ANSWER:**   Paragraph 185 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 185 of the Complaint.

186.   N.P. Standfuss wrote in her chart note that she "was not the scheduled on-call provider at [the] time however did take the call."

**ANSWER:**   Paragraph 186 of the Complaint is not directed to these Answering

Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 184 of the Complaint, and, therefore, must deny them.

187. At 9:50, Sgt. Polack drafted the following Jail Staff Medical Documentation Form:



**ANSWER:**    These Answering Defendants admit that Sergeant Polack drafted the above

document and signed it at 21:50.

188.     On October 17, 2022, approximately five hours after Nick's death, Sgt. Polack also drafted a report, where he described his conversation with N.P. Standfuss as follows:

> At approximately 2130 hours I decided to conduct a vitals check on Norberg due to him breathing heavy and stating that he was having difficulty breathing. I and Officer Schmitz entered the cell and applied handcuffs to Norberg. We were unable to obtain a good blood-pressure reading on Norberg due to him moving. We did get a O2 saturation level that stayed between 96% and 99% and a pulse rate between 135-147 beats per minute. I contacted the on-call medical provider and updated her with all the information that I had. I was advised to give Norberg 1mg of Ativan from the medical E-kit and follow-up with her in 2 hours if the inmates chief complaint became worse.

**ANSWER:**  The document referenced in Paragraph 188 speaks for itself and no response is necessary. To the extent a response may be required, the Defendants admit that Paragraph 188 correctly quotes a portion of Sergeant Polack's report.

189.     N.P. Standfuss did not draft her chart note of this encounter until October 19, 2022, at 5:30 p.m., well over two days after Nick's death.

**ANSWER:**  Paragraph 189 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 188 of the Complaint.

190.     N.P. Standfuss wrote as follows:

**Other Provider Notes**

---

**Telephone Encounter by Standfuss, Catherine J, APRN,CNP at 10/16/2022 2135**

| | | |
|---|---|---|
| Author: Standfuss, Catherine J, APRN,CNP | Service: — | Author Type: Nurse Practitioner |
| Filed: 10/19/2022 5:30 PM | Encounter Date: 10/17/2022 | Status: Addendum |
| Editor: Standfuss, Catherine J, APRN,CNP (Nurse Practitioner) | | |

Correctional care on-call coverage (late entry). Called by Sgt on duty at Stearns County Jail regarding inmate at approximately 2135. Note - I was not the scheduled on-call provider at this time however did take the call. Sgt on duty reports inmate was picked up by law enforcement about 90 minutes prior, per report was found in a store surrounded by multiple cans of duster. He was brought to the ER and cleared. The ER note is not yet available for review at the time of the call, however I did review hospital discharge summary dated 9/18/2022 during the call. Concerns from Sgt were agitation and that they were having a difficult time obtaining vitals due to agitation. He was noted to have O2 saturation between 96-98% on room air. His blood pressure was normal per report. He was tachycardic between 110-140. I note in DC summary from 9/18/2022 that he was also noted to have variable BP/HR and did have Hospitalist consult prior to discharge. I did ask the Sgt to administer Ativan 1 mg now to target symptoms of agitation and to call within 1-2 hours if the agitation has not improved. I did then notify the on-call provider (Bri Eriksson, CNP) of the call, should there be any additional calls overnight.

Electronically signed by Standfuss, Catherine J, APRN,CNP at 10/19/2022 5:30 PM

**ANSWER:** Paragraph 190 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 190 of the Complaint.

191. N.P. Standfuss did not accurately chart her conversation with Sgt. Polack.

**ANSWER:** Paragraph 191 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as what Standfuss may have charted, and, therefore, must deny the allegation.

192. Sgt. Polack wrote after Nick's death that he "provided and updated her with all the information that [he] had."

**ANSWER:** Sergeant Polack's report speaks for itself and no response to Paragraph 192 is necessary. To the extent a response may be required, these Answering Defendants admit that Polack's report stated that he "contacted the on-call medical provider and updated her

with all the information that [he] had."

193.    N.P. Standfuss did not chart the critical information that Sgt. Polack conveyed to her that Nick was having trouble breathing.

**ANSWER:**    Paragraph 193 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193 of the Complaint, and, therefore, must deny them.

194.    N.P. Standfuss also charted that Nick's heart rate was between 110 – 140, when Sgt. Polack informed her that Nick's pulse was 135 – 147, i.e., that he was severely tachycardic.

**ANSWER:**    These Answering Defendants admit that Sergeant Polack informed the on-call medical provider that he had measured Nick's pulse at 135 to 147 beats per minute. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 194 of the Complaint, and, therefore, must deny them.

195.    Despite the normal oxygen saturation level, Sgt. Polack provided N.P. Standfuss with information that reflected an inmate with serious medical needs and potentially life-threatening conditions.

**ANSWER:**    These Answering Defendants admit that Sergeant Polack provided all of the information he had to the on-call medical provider, but Defendants lack knowledge or

66

information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 195 of the Complaint, and, therefore, must deny them.

196.   Even the oxygen saturation level should have been viewed skeptically by N.P. Standfuss, given that Nick's vitals were not taken by medical professionals and N.P. Standfuss knew that it was a struggle to obtain vital readings.

**ANSWER:**   Paragraph 196 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 196 of the Complaint, and, therefore, must deny them.

197.   As an employee or other agent of CC System, N.P. Standfuss had access to Nick's CC Hospital ED records.

**ANSWER:**   Paragraph 197 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 197 of the Complaint, and, therefore, must deny them.

198.   N.P. Standfuss acknowledged she could not yet view the ED Visit chart notes, so she had no ability to compare Nick's vitals and signs being reported to the Jail to his status earlier that evening.

**ANSWER:**   Paragraph 198 of the Complaint is not directed to these Answering

Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198 of the Complaint, and, therefore, must deny them.

199.    N.P. Standfuss made no effort to contact the ED providers to learn about Nick's medical condition, even though notes from that visit were not yet available for her viewing.

**ANSWER:**    Paragraph 199 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 199 of the Complaint, and, therefore, must deny them.

200.    The medical standard of care required that N.P. Standfuss recommend that Nick immediately be seen in person by a health care professional for further evaluation.

**ANSWER:**    Paragraph 200 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 200 of the Complaint, and, therefore, must deny them.

201.    If N.P. Standfuss was unable to immediately see Nick herself, the standard of care required that Nick see a different provider immediately.

**ANSWER:**   Paragraph 201 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 201 of the Complaint, and, therefore, must deny them.

202.   If no providers were available at the Jail, the standard of care required that Nick go to the emergency room.

**ANSWER:**   Paragraph 202 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 202 of the Complaint, and, therefore, must deny them.

203.   The standard of care at this time required that Nick receive close medical monitoring and, more likely than not, treatment and intervention.

**ANSWER:**   Paragraph 203 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 203 of the Complaint, and, therefore, must deny them.

204.   N.P. Standfuss knew that the Jail did not have the necessary medical equipment to closely monitor Nick the way the standard of care required that he be

monitored.

**ANSWER:** Paragraph 204 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 204 of the Complaint, and, therefore, must deny them.

205. N.P. Standfuss based some of her decision-making from Nick's September 18, 2022 ED Visit.

**ANSWER:** Paragraph 205 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 205 of the Complaint, and, therefore, must deny them.

206. The information contained in the September 18, 2022 ED Visit did not remotely suggest that Norberg did not need immediate medical attention or that N.P. Standfuss should deviate from the standards of care described above.

**ANSWER:** Paragraph 206 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 206 of the Complaint, and, therefore, must deny them.

207.     If anything, the September 18, 2022 ED Visit reflected an even greater need to get Nick immediate medical attention.

**ANSWER:**    Paragraph 207 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 207 of the Complaint, and, therefore, must deny them.

208.     For example, Nick's history of inhalant use put him at even greater risk for harm. The "borderline" ECG from that visit also put him at a great potential risk of harm.

**ANSWER:**    Paragraph 208 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 208 of the Complaint, and, therefore, must deny them.

209.     N.P. Standfuss knew this and ignored it.

**ANSWER:**    Paragraph 209 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 209 of the Complaint, and, therefore, must deny them.

210.     Instead of providing Nick with treatment, N.P. Standfuss violated the

71

medical standard of care even further by simply prescribing Nick with 1 mg of Ativan and recommending that Jail Staff "follow-up in two hours if behavior continues."

**ANSWER:**   These Answering Defendants admit that Defendant Standfuss instructed Sergeant Polack to administer 1 mg of Ativan to Nick and recommended that jail staff "follow up in two hours if behavior continues." The remaining allegations contained in Paragraph 210 are not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 210 of the Complaint, and, therefore, must deny them.

211.   Ativan (lorazepam) is a controlled substance, classified as a Schedule IV drug under the Controlled Substances Act.

**ANSWER:**   Paragraph 211 consists of legal conclusions and no response is necessary. To the extent a response may be required, these Answering Defendants admit the allegations contained in Paragraph 211 of the Complaint.

212.   Prior to prescribing Ativan for a patient, the standard of care requires, among other things, that the provider:

(a)   take a comprehensive medical history, including history of substance abuse, mental health conditions, and current medications;

(b)   conduct a physical examination of the patient to rule out any contraindications;

(c)   ensure there is a clear indication for use;

72

(d)     explain medical risks, including the risk of addiction in the case of Ativan, and obtain informed consent; and

(e)     monitor the patient for adverse reactions or side effects.

**ANSWER:**  Paragraph 212 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 212 of the Complaint, and, therefore, must deny them.

213.     N.P. Standfuss not only violated the standard of care in prescribing Nick Ativan, she did so with deliberate indifference to the objectively serious medical needs Nick was exhibiting and that were conveyed to her, particularly in light of Nick's available medical history.

**ANSWER:**   Paragraph 213 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 213 of the Complaint, and, therefore, must deny them.

214.     N.P. Standfuss also charted that: "I did then notify the on-call provider (Bri Eriksson, CNP) of the call, should there be any additional calls overnight."

**ANSWER:**   Paragraph 214 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be

required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 214 of the Complaint, and, therefore, must deny them.

215.    N.P. Eriksson's charting—described in detail below—reflects that she was oblivious to Nick's condition, as evidenced by her notes and orders for a deceased patient.

**ANSWER:**    Paragraph 215 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 215 of the Complaint, and, therefore, must deny them.

216.    The records suggest that N.P. Standfuss never informed Eriksson of Nick's existence or condition.

**ANSWER:**    Paragraph 216 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 216 of the Complaint, and, therefore, must deny them.

217.    N.P. Standfuss's conduct exhibited a particular and deliberate disregard for the high probability for harm to Nick for several reasons, including:

(a)    having an insufficient clinical picture to prescribe Ativan, a sedative that had the potential to further compromise Nick's respiratory or cardiovascular function,

particularly given that Nick had a history of polysubstance dependence, hypertension, and recent inhalant abuse, which put him at a high risk for respiratory and cardiovascular complications;

(b)     knowing that Nick was being detained at a jail, where Nick was not free to obtain his own medical care and where Nick would not receive the same level of medical monitoring and care that he would receive in a medical setting;

(c)     not requiring that Nick's vitals be rechecked following the administration of the Ativan; and

(d)     ignoring all the signs and symptoms requiring Nick to receive more comprehensive and immediate medical attention from trained providers.

**ANSWER:**  Paragraph 217 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 217 of the Complaint, and, therefore, must deny them.

218.    Had Nick received treatment within the standard of care from N.P. Standfuss, Nick would have immediately seen a health care professional, and a health care professional acting reasonably would have directed that Nick be returned to the CC Hospital ED.

**ANSWER:**   Paragraph 218 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be

required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 218 of the Complaint, and, therefore, must deny them.

219.    Had no professional been available to see Nick at the Jail, Nick would have immediately been returned to the CC Hospital ED, as Dr. Falvey's note instructed.

**ANSWER:**   Paragraph 219 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, the allegations are too vague and indefinite for these Answering Defendants to response with an admission or denial.

220.    Had Nick been returned to the CC Hospital ED and received reasonable medical care, more likely than not, Nick would not have died on October 17, 2022.

**ANSWER:**   Paragraph 220 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 220 of the Complaint, and, therefore, must deny them.

221.    Had N.P. Standfuss complied with the medical standard of care, more likely than not, Nick would not have died on October 17, 2022.

**ANSWER:**   Paragraph 221 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 221 of the Complaint, and, therefore, must deny them.

**G.   Despite Nick's condition worsening, no one helped him, and Sgt. Polack— with deliberate indifference to Nick's serious medical needs—reduced Nick's monitoring just prior to his death.**

**ANSWER:**   These Answering Defendants admit the Taser Watch for Nick expired at approximately 01:10, but deny the remaining allegations contained in Paragraph G of the Complaint.

222.   Between taking Nick's vitals and administering the Ativan, Nick continued to be in obvious medical distress.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 222 of the Complaint.

223.   At approximately 9:40 p.m., a C.O. glanced into Nick's cell and saw him hunched over the toilet attempting to drink water.

**ANSWER:**   These Answering Defendants admit that corrections officers checked on Nick and observed him in his cell at approximately 9:40 p.m., and that one of the corrections officers was checking on Nick while he positioned himself in front of the toilet, but deny the remaining allegations contained in Paragraph 223 of the Complaint.

224.   The check-in was so brief, it is unclear whether the C.O. saw Nick collapse onto the floor gasping for air within seconds.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 224 of the Complaint.

77

225.     At 9:43 p.m., a C.O. observed Nick drinking toilet water.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 225 of the Complaint.

226.     Minutes later, Nick crawled to the door and banged on it to request medical attention.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 226 of the Complaint.

227.     At 9:47 p.m., a C.O. attempted to give Nick a glass of water.

**ANSWER:**     These Answering Defendants admit the allegations contained in Paragraph 227 of the Complaint.

228.     Nick was too weak and distressed to grasp the cup.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 227 of the Complaint.

229.    The C.O. observed Nick spill it onto himself and then collapse.



**ANSWER:**    These Answering Defendants admit that a corrections officer observed Nick spill the cup of water provided to him, and that the corrections officer then brought him another cup of water, but deny the remaining allegations contained in Paragraph 229 of the Complaint.

230.    At 9:50 p.m., Sgt. Polack returned to Nick's cell to give him the Ativan N.P. Standfuss prescribed.

**ANSWER:**   These Answering Defendants admit that at about 9:50 p.m. Sergeant Polack provided Nick with 1 mg of Ativan at Defendant Standfuss's direction.

231.    Sgt. Polack gave Nick the pill, but Nick was in too much distress and was

too cognitively and physically impaired to administer the pill himself.

**ANSWER:** These Answering Defendants admit that Sergeant Polack provided the Ativan pill to Nick, but deny the remaining allegations contained in Paragraph 231 of the Complaint.

232. Nick repeatedly dropped the pill and then lost the pill in the mattress while C.O. Theis, Sgt. Polack, and another C.O. observed Nick struggle to self-administer the Ativan (i.e., put a pill in his mouth and swallow it) for roughly five minutes.



**ANSWER:** These Answering Defendants admit that Sergeant Polack and other corrections officers observed Nick drop the medication and then look for it, and that Nick ingested the pill himself, but deny the remaining allegations contained in Paragraph 232 of the Complaint.

233. At this point, Nick was covered in sweat, vomit, and toilet water.

**ANSWER:**   These Answering Defendants admit that Nick was perspiring, but deny the remaining allegations contained in Paragraph 233 of the Complaint.

234.   Nick was unable to hold a cup, sit upright for longer than a few seconds, and was visibly gasping for breath.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 234 of the Complaint.

235.   Other C.O.s looked into the room to view the scene of Nick struggling to self-administer the Ativan.

**ANSWER:**   These Answering Defendants admit Sergeant Polack and other corrections officers observed Nick take the medication, but deny the remaining allegations contained in Paragraph 235 of the Complaint

236.   At this point, any layperson would understand that Nick had objectively serious and obvious medical needs that required immediate treatment by a doctor.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 236 of the Complaint.

237.   Following Nick's self-administration of Ativan, C.O.s looked into his cell for less than ten seconds, observing Nick in various states of distress.

**ANSWER:**   These Answering Defendants admit that, because Nick was on a Taser Watch, well-being checks were conducted by jail staff at least every ten minutes, but deny the remaining allegations contained in Paragraph 237 of the Complaint.

238.   The C.O.'s continued to ignore Nick's need for medical attention.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 238 of the Complaint.

239.    Nick's difficulty breathing, vomiting, and face discoloration continued.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 239 of the Complaint.

240.    At 11:10 p.m., Nick staggered over to the cell door and banged on the cell window, begging to get help for his serious medical needs.

**ANSWER:**    These Answering Defendants admit that, at approximately 11:10 p.m., Nick knocked on the cell door and that a corrections officer immediately approached to speak with him, but deny the remaining allegations contained in Paragraph 240 of the Complaint.

241.    No help came and Nick stumbled to the cell bench.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 241 of the Complaint.

242.    A C.O. peered into Nick's cell through the cell window, then walked away.

**ANSWER:**   These Answering Defendants admit that a corrections officer approached the door, spoke with Nick, and then walked away, but deny the implication that the corrections officer walked away without speaking to Nick.

243.    Nick flopped onto the mattress that lay on the floor and, a minute later, rolled onto his knees and lunged to the toilet.

**ANSWER:**    These Answering Defendants admit that Nick returned to the mattress after speaking with the corrections officer, but deny the remaining allegations contained in

Paragraph 243 of the Complaint.

244.    Nick vomited into the toilet, then flushed it and drank the toilet water.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 244 of the Complaint.

245.    Nick then rolled onto his back on the mat, where he laid for the next two hours, obviously struggling to breathe and with obvious discoloration to his face.

**ANSWER:**   These Answering Defendants admit that Nick laid on the mat in his cell, but deny the remaining allegations contained in Paragraph 245 of the Complaint.

246.    Over the next two hours, C.O.s Epple and Theis both conducted multiple well-being checks on Nick.

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 246 of the Complaint.

247.    Both C.O. Epple and C.O. Theis knew that Nick had been seen at the hospital that evening for abusing inhalants.

**ANSWER:**   These Answering Defendants admit the allegations contained in Paragraph 247 of the Complaint.

248.    Both C.O. Epple and C.O. Theis observed Nick experiencing objectively serious, obvious, and worsening medical condition throughout the evening.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 248 of the Complaint.

249.    Neither C.O. Epple nor C.O. Theis did anything to mitigate his serious

medical condition, despite the obvious signs of serious medical distress, as reflected in the images below:



**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 249 of the Complaint.

250.   Over the next two hours, Sgt. Polack made no effort to recheck Nick's vitals, determine if Nick was still having difficulty breathing, or any other effort to ensure that Nick's serious medical needs were being addressed.

**ANSWER:**   These Answering Defendants admit that other corrections officers performed the well-being checks during the stated timeframe, and that Sergeant Polack did not do so personally and did not attempt to recheck Nick's vital signs, but deny the remaining allegations contained in Paragraph 250 of the Complaint.

251.     To the contrary, at 1:10 a.m. and with deliberate indifference to Nick's serious medical needs, Sgt. Polack took Nick off a special watch and instructed the Jail C.O.s to cease performing 10-minute well-being checks on Nick.

**ANSWER:**   These Answering Defendants admit that the Taser Watch on Nick expired after he had been at the jail for four hours, but deny the remaining allegations contained in Paragraph 251 of the Complaint.

252.     Sgt. Polack reduced Nick's well-being checks to the standard well-being checks that the Jail C.O.s were conducting on a 25-minute schedule.

**ANSWER:**   These Answering Defendants admit that, following the end of the Taser Watch, Nick was placed on a standard watch, and well-being checks were performed at least every 25 minutes. Defendants deny the remaining allegations contained in Paragraph 252 of the Complaint.

253.     Sgt. Polack removed Nick from this special watch without ever rechecking his vitals or breathing, without conducting the mandated medical screening, and without guidance or advice from any medical provider.

**ANSWER:**   These Answering Defendants admit that Sergeant Polack did not retake Nick's vital signs when the Taser Watch expired, but deny the remaining allegations contained in Paragraph 253 of the Complaint.

254.     Shortly after this special watch was terminated, Nick made his final gasps for air at 1:23 a.m.



**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 254 of the Complaint.

255.    Approximately eight minutes later, C.O. Tracy Skonseng performed a well-being check on Nick and did nothing about Nick's obvious discoloration and absent breathing.

**ANSWER:**    These Answering Defendants admit that Corrections Officer Tracy Skonseng performed a well-being check at approximately 01:30, but deny the remaining allegations contained in Paragraph 255 of the Complaint.

256.    The guard did not alert anyone to Nick's serious and obvious medical state.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 256 of the Complaint.

257.    Nick's lifeless body laid for another 25 minutes before the next well-being

check.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 257 of the Complaint.

258.     Guards, and later first responders, administered first aid to Nick, including several failed attempts to revive his heart with an automated external defibrillator.

**ANSWER:**     These Answering Defendants admit the allegations contained in Paragraph 258 of the Complaint.

259.     Nick was pronounced dead just after 2:30 a.m.

**ANSWER:**     These Answering Defendants admit the allegations contained in Paragraph 259 of the Complaint.

260.     Nick died as a result of cardiac dysfunction.

**ANSWER:**     These Answering Defendants assert that the cause of death listed in the autopsy report is complications of chronic substance abuse with acute intoxication, and therefore, deny the allegations contained in Paragraph 260 of the Complaint.

261.     More likely than not, Nick would not have died on October 17, 2022, were it not for the failures of Sgt. Polack, C.O. Epple, C.O. Theis, and potentially other Jail staff to be further identified through discovery.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 261 of the Complaint.

262.     The following morning, in an additional display of deliberate indifference to Nick's objectively serious medical condition—now, his death—Nurse Eriksson entered

a progress note into Nick's Jail medical record at 9:54 a.m. the morning of his death, believing him to be alive.

**ANSWER:**   Paragraph 262 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 262 of the Complaint, and, therefore, must deny them.

263.    Under Care Management, she wrote "Patient was booked into the Stearns County Jail. / Routine admission orders were entered. / Nursing will complete the usual health assessment."

**ANSWER:**   Paragraph 263 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 263 of the Complaint, and, therefore, must deny them.

264.    Routine admission orders were never entered, and it was then impossible for her, or any other practitioner, to complete the usual health assessment. Nurse Eriksson signed the progress note.

**ANSWER:**   Paragraph 264 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 264 of the Complaint, and, therefore, must deny them.

265.    Nurse Eriksson also ordered a number of actions to be taken including "obtaining an extended set of vitals . . . and PRN if there are changes in the inmate's health status . . . Administer [inhaler] every 20 minutes up to 4 hours" in the event of "shortness of breath."

**ANSWER:**    Paragraph 265 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 265 of the Complaint, and, therefore, must deny them.

266.    Nurse Eriksson's charting reflected further that N.P. Standfuss did not inform Eriksson of Nick's objectively serious and obvious medical needs.

**ANSWER:**    Paragraph 266 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 266 of the Complaint, and, therefore, must deny them.

267.    On the morning of Nick's death, Dr. David Frenz, CC System Medical Director for Coordinated Care Services and Correctional Care answered an email about Nick's death.

**ANSWER:** Paragraph 267 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants admit that Defendant Maslonkowski received an email from Dr. Frenz on October 17, 2022.

268. He responded, explaining that sudden sniffing death syndrome is a known life-threatening occurrence.

| | |
|---|---|
| **From:** | Frenz, David <David.Frenz@centracare.com> |
| **Sent:** | Monday, October 17, 2022 10:11 AM |
| **To:** | Maslonkowski, Mark |
| **Cc:** | Kelly Schreifels |
| **Subject:** | Fw: Death |

@Captain Mark Maslonkowski, Kelly looped me in right away this morning

The medical examiner (ME) should be alerted to the patient's history of inhalant abuse immediately prior to his death. Sudden sniffing death syndrome is a known clinical entity, likely with various underlying causes (e.g., seizure, sudden cardiac death). Inhalants are difficult to detect on toxicology as they are very transient, although perhaps the ME can assess for them. It might be helpful to know which product he was using at Walmart. Not sure if those details appear in the police report or if the report can be amended to include them

—

David A. Frenz, M.D. | Medical Director

**ANSWER:** The above email speaks for itself and no response is necessary to Paragraph 268 of the Complaint. To the extent a response may be required, these Answering Defendants admit that the above document accurately reflects an email received by Captain Mark Maslonkowski on October 17, 2022.

269. Had Defendants complied with the medical standard of care and acted without deliberate indifference to Nick's objectively serious and obvious medical needs, Nick would not have died on October 17, 2022.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 269 of the Complaint.

270.    Minnesota statutes required that, as an in-custody death, a "death review" be conducted.

**ANSWER:**    Paragraph 270 is a legal conclusion to which no response is necessary, but to the extent that an answer may be required, these Answering Defendants admit that a review of Nick's in-custody death was performed.

271.    Dr. Frenz participated in that death review.

**ANSWER:**    These Answering Defendants admit that Dr. Frenz participated in a review of Nick's death.

272.    After Nick's death, Assistant Commissioner of Corrections Connie Jones wrote in a May 4, 2023 letter that: "A final death review was completed as required by statute and was reviewed by the inspector.  The death review noted several concerns regarding the care Mr. Norberg received while he was at the St. Cloud hospital."

**ANSWER:**    The letter referenced speaks for itself and no response is necessary to Paragraph 272 of the Complaint. To the extent a response may be required, Defendants admit that Paragraph 272 accurately quotes a portion of a letter dated May 4, 2023 and written by Assistant Commissioner of Corrections Connie Jones.

## Count I

### 42 U.S.C. § 1983
### Fourteenth Amendment Violations
*Plaintiffs v. N.P. Catherine Standfuss, Sgt. Steven Polack, C.O. Makayla Epple, and*
*C.O. Micah Theis, all in their individual capacities*

91

273.     Plaintiffs incorporate all allegations as if fully stated herein.

**ANSWER:**   No response is necessary to Paragraph 273 of the Complaint.

274.     Nick suffered from objectively serious and medical needs that would have been obvious to any layperson.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 274 of the Complaint.

275.     The Defendants named in this Count owed Nick a duty to provide for Nick's medical needs, safety, and general welfare.

**ANSWER:**   Paragraph 275 is a legal conclusion to which no response is necessary, but to the extent that an answer may be required, Defendants admit that Paragraph 275 of Plaintiffs' Complaint is a generally accurate statement of the law, but deny that they breached any duty owed to Nick or the Plaintiffs.

276.     The Defendants named in this Count knew that Nick had serious medical needs that created a high risk of harm, including death, if not properly assessed, addressed, and monitored.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 276 of the Complaint.

277.     The Defendants named in this Count, under color of state law, acted with deliberate indifference to Nick's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph

92

277 of the Complaint.

278.    Plaintiffs allege in the alternative that each of these Defendants knew that Nick was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Nick's rights were violated.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 278 of the Complaint.

279.    With respect to Sgt. Polack, he is also liable for these constitutional violations in his capacity as a supervisor (i.e., supervisory liability).

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 279 of the Complaint.

280.    Any medical care that was provided by N.P. Standfuss deviated so substantially from professional standards that it amounted to deliberate indifference.

**ANSWER:**    Paragraph 280 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 280 of the Complaint, and, therefore, must deny them.

281.    As a result, the Defendants named in this Count engaged in conduct that was in violation of the Fourteenth Amendments to the United States Constitution.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph

281 of the Complaint.

282.     Nick died as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 282 of the Complaint.

283.     As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Nick sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury, including but not limited to pain and suffering and loss of enjoyment of life.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 283 of the Complaint.

284.     Plaintiffs allege they are entitled to seek punitive damages for this conduct as a matter of federal common law.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 284 of the Complaint.

285.     Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 285 of the Complaint.

286.     The conduct described herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 286 of the Complaint.

287.   As a direct and proximate result of these wrongful acts and omissions, Nick's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 287 of the Complaint.

### Count II

**Wrongful Death Under Minnesota State Law – Medical Malpractice**
*Plaintiffs v. Dr. Daniel Falvey, N.P. Catherine Standfuss, CentraCare Health System d/b/a CentraCare – St. Cloud Hospital, The Saint Cloud Hospital d/b/a CentraCare – St. Cloud Hospital, CentraCare Clinic, and Stearns County*

288.   Plaintiffs incorporate all allegations as if fully stated herein.

**ANSWER:**   No response is necessary to Paragraph 288 of the Complaint.

289.   The Defendants named in this Count owed Nick a duty to provide Nick with medical treatment that complied with the relevant standard of medical care.

**ANSWER:**   Paragraph 289 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 289 of the Complaint, and, therefore, must deny them.

290.   CC System and/or The Saint Cloud Hospital are liable for the conduct of Dr.

Falvey through the doctrines of respondeat superior and/or apparent authority.

**ANSWER:**   Paragraph 290 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 290 of the Complaint, and, therefore, must deny them.

291.   Defendant CentraCare Clinic is vicariously liable for the conduct of N.P. Standfuss through the doctrines of respondeat superior and/or apparent authority.

**ANSWER:**   Paragraph 291 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 291 of the Complaint, and, therefore, must deny them.

292.   The County is liable for the conduct of N.P. Standfuss because it has a nondelegable duty to provide healthcare to its detainees.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 292 of the Complaint.

293.   Dr. Falvey and N.P. Standfuss knew or should have known that Nick was at a high risk of death, given his prior medical history and current medical condition.

**ANSWER:**   Paragraph 293 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be

required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 293 of the Complaint, and, therefore, must deny them.

294.    Dr. Falvey and N.P. Standfuss deviated from the requisite professional standards of care with respect to Nick, as detailed herein and as shall be set forth with additional discovery.

**ANSWER:**   Paragraph 294 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 294 of the Complaint, and, therefore, must deny them.

295.    A declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 3, is attached as Exhibit A.

**ANSWER:**   No response is necessary to Paragraph 295 of the Complaint.

296.    The conduct herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

**ANSWER:**   Paragraph 296 of the Complaint is not directed to these Answering Defendants and consists of legal conclusions, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 296 of the Complaint, and, therefore, must deny them.

297.    These wrongful act and omissions directly and proximately caused Nick's death.

**ANSWER:**    Paragraph 297 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 297 of the Complaint, and, therefore, must deny them.

298.    These wrongful acts and omissions caused Nick to endure pain and suffering in addition to all other available categories of compensatory damages.

**ANSWER:**    Paragraph 298 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 298 of the Complaint, and, therefore, must deny them.

299.    As a direct and proximate result of these wrongful acts and omissions, Nick's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**ANSWER:**    Paragraph 299 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 299 of the Complaint, and, therefore, must

deny them.

300.    Plaintiffs are entitled to seek punitive damages for this conduct.

**ANSWER:**    Paragraph 300 of the Complaint is not directed to these Answering

Defendants and, therefore, no response is necessary. To the extent a response may be

required, Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 300 of the Complaint, and, therefore, must

deny them.


## Count III

### Wrongful Death Under Minnesota State Law - Negligence
*Plaintiffs v. Stearns County, Sgt. Steven Polack, C.O. Makayla Epple, and
C.O. Micah Theis*

301.    Plaintiffs incorporate all allegations as if fully stated herein.

**ANSWER:**    No response is necessary to Paragraph 301 of the Complaint.

302.    The Defendants in this Count owed Nick a duty of reasonable care and to

provide for his well-being and safety.

**ANSWER:**    Paragraph 302 is a legal conclusion to which no response is necessary, but

to the extent that an answer may be required, Defendants admit that Paragraph 302 of

Plaintiffs' Complaint is a generally accurate statement of the law, but deny that they

breached any duty owed to Nick or the Plaintiffs.

303.    The Defendants breached these duties, including ministerial and operational

duties as described herein.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 303 of the Complaint.

304. The County is directly liable for its operational failures.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 304 of the Complaint.

305. The County is also vicariously liable for the individual acts and omissions identified herein, including breach of ministerial duties, as those individuals were acting within the course and scope of their duties as County employees.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 305 of the Complaint.

306. The conduct herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 306 of the Complaint.

307. These wrongful act and omissions directly and proximately caused Nick's death.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph 307 of the Complaint.

308. These wrongful acts and omissions caused Nick to endure pain and suffering in addition to all other available categories of compensatory damages.

**ANSWER:** These Answering Defendants deny the allegations contained in Paragraph

308 of the Complaint.

309.     As a direct and proximate result of these wrongful acts and omissions, Nick's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 309 of the Complaint.

310.     Plaintiffs are entitled to seek punitive damages for this conduct.

**ANSWER:**     These Answering Defendants deny the allegations contained in Paragraph 310 of the Complaint.

## Count IV

**Injury Action Under Minn. Stat. § 573.02, subd. 2 – Survival of Medical Malpractice** *Plaintiffs v. Dr. Daniel Falvey, N.P. Catherine Standfuss, CentraCare Health System d/b/a CentraCare – St. Cloud Hospital, The Saint Cloud Hospital d/b/a CentraCare – St. Cloud Hospital, CentraCare Clinic, and Stearns County*

311.     Plaintiffs incorporate all allegations as if fully stated herein.

**ANSWER:**     No response is necessary to Paragraph 311 of the Complaint.

312.     Alternatively, should a jury conclude that the acts and omissions described by the Defendants named in this Count did not cause Nick's death, these Defendants are still liable for the damages caused by their negligent acts and omissions that injured Nick but did not cause his death.

**ANSWER:**     Paragraph 312 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be

required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 312 of the Complaint, and, therefore, must deny them.

313.    These Defendants' direct and/or vicarious acts and omissions directly and proximately caused Nick to endure conscious pain, suffering, emotional distress, and loss of enjoyment of life prior to his death.

**ANSWER:**    Paragraph 313 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 313 of the Complaint, and, therefore, must deny them.

314.    The wrongful acts of these Defendants also would have directly and proximately caused Nick to endure future pain, suffering, emotional distress, and loss of enjoyment of life had he continued to live.

**ANSWER:**    Paragraph 314 of the Complaint is not directed to these Answering Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 314 of the Complaint, and, therefore, must deny them.

315.    Plaintiffs are entitled to seek punitive damages for this conduct.

**ANSWER:**    Paragraph 315 of the Complaint is not directed to these Answering

Defendants and, therefore, no response is necessary. To the extent a response may be required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 315 of the Complaint, and, therefore, must deny them.

## Count V

**Injury Action Under Minn. Stat. § 573.02, subd. 2 – Survival of Negligence**
*Plaintiffs v. Stearns County, Sgt. Steven Polack, C.O. Makayla Epple, and C.O. Micah Theis*

316.    Plaintiffs incorporate all allegations as if fully stated herein.

**ANSWER:**    No response is necessary to Paragraph 316 of the Complaint.

317.    Alternatively, should a jury conclude that the acts and omissions described by the Defendants named in this Count did not cause Nick's death, these Defendants are still liable for the damages caused by their negligent acts and omissions that injured Nick but did not cause his death.

**ANSWER:**  These Answering Defendants deny the allegations contained in Paragraph 317 of the Complaint.

318.    The County is directly liable for its operational failures as set forth herein.

**ANSWER:**    These Answering Defendants deny the allegations contained in Paragraph 318 of the Complaint.

319.    The County is vicariously liable for the individual acts and omissions identified herein, including breach of ministerial duties, as those individuals and those acting under their control were acting within the course and scope of their duties as County

employees.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 319 of the Complaint.

320.   The County's direct and/or vicarious acts and omissions directly and proximately caused Nick to endure conscious pain, suffering, emotional distress, and loss of enjoyment of life prior to his death.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 320 of the Complaint.

321.   The wrongful acts of these Defendants also would have directly and proximately caused Nick to endure future pain, suffering, emotional distress, and loss of enjoyment of life had he continued to live.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 321 of the Complaint.

322.   Plaintiffs are entitled to seek punitive damages for this conduct.

**ANSWER:**   These Answering Defendants deny the allegations contained in Paragraph 322 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

1. Plaintiffs' Complaint fails to state a claim or claims upon which relief may be granted.

2. These Answering Defendants were performing discretionary acts within the scope of their duties with a good faith belief their conduct was lawful, constitutional, and proper.

3. Plaintiffs' claims are barred, in whole or in part, but the statute of limitations or doctrine of laches.

4. Plaintiffs' claims are barred by statutory discretionary immunity.

5. Plaintiff's claims are barred by the doctrines of official immunity and vicarious official immunity.

6. Plaintiffs' claims are barred by the doctrine of qualified immunity.

7. Plaintiffs' claims are barred, in whole or in part, by the provisions of Minn. Stat. § 466.03 (2023).

8. Plaintiffs' recovery of damages, if any, is subject to the limitations established by Minn. Stat. § 466.04 (2023).

9. To the extent the Plaintiffs are seeking punitive damages for alleged violations of rights arising under state law, their claim is improperly pled under Minn. Stat. § 549.191 and must be stricken.

10. Any actions or inactions attributable to these Answering Defendants were not the direct or proximate cause of any damages to the Plaintiffs, individually and/or jointly.

11. Plaintiffs' damages, if any, are the result of actions by others which these Answering Defendants had no authority to direct or control and for which these Answering Defendants have no legal responsibility.

12. These Answering Defendants acted in good faith and in reasonable reliance upon the guidance of medical professionals.

13. Plaintiffs and Nickolas Norberg voluntarily assumed any risk inherent in the circumstances giving rise to the events alleged in the Complaint.

14. Recovery is barred in this action, in whole or in part, by the contributory and/or comparative negligence, or other acts, of third persons, including Nickolas Norberg, Defendants CentraCare Health System d/b/a CentraCare – St. Cloud Hospital, The Saint Cloud Hospital d/b/a CentraCare – St. Cloud Hospital, CentraCare Clinic, Daniel Falvey, M.D., and Catherine Standfuss, APRN.

15. Defendants, pending further discovery, reserve the right to assert any and all other affirmative or other defenses that may be available.

**WHEREFORE**, Defendant prays for relief and judgment against the Plaintiff as follows:

      A.      That Plaintiff takes nothing by reason of the Complaint;

      B.      That this action be dismissed with prejudice;

      C.      That these Answering Defendants recover their fees, costs and attorneys' fees incurred herein; and

    D.      Such further and other relief as the Court deems just and proper.

Dated: July 30, 2024                  **EVERETT LAW, LLC**

                              s/Anna L. Yunker
                           William J. Everett, No. 207275
                           Anna L. Yunker, No. 392551
                           100 Center Drive
                           Buffalo, MN 55313
                           anna@everettlawllc.com
                           (763) 682-9800

                           ***Attorneys for Stearns County Defendants***