## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Dan Norberg and Susan Norberg,                    Case No. 24-cv-02023 (JMB/LIB)
as co-trustees for the next of kin of
Nickolas Daniel Norberg, Deceased,

               Plaintiffs,

      v.

CentraCare Health System d/b/a
CentraCare – St. Cloud Hospital,
The Saint Cloud Hospital d/b/a
CentraCare – St. Cloud Hospital,
CentraCare Clinic, Daniel Falvey, M.D.
Emergency Physicians Professional Association,
Catherine Standfuss, APRN, in her individual capacity,
Sgt. Steven Polack, in his individual capacity,
Makayla Epple, in her individual capacity,
Micah Theis, in his individual capacity, and
Stearns County, Minnesota,

               Defendants.

**Memorandum in Support of Plaintiffs' Motion for Leave to Amend Complaint**

## <u>Introduction</u>

Plaintiffs Dan Norberg and Susan Norberg, as co-trustees for the next of kin of

Nickolas Daniel Norberg ("Nick"), Deceased ("Plaintiffs") respectfully seek leave to

file a Second Amended Complaint ("SAC")[1] to add Briana Eriksson-Kotschevar, APRN

("N.P. Eriksson-Kotschevar") in her individual capacity as a defendant, alleging

---

[1] Storms Dec. Exs. A and B (redline).

Fourteenth Amendment violations for her own deliberate indifference and for a failure to intervene, in addition to state law claims for wrongful death or, in the alternative, survival.  Plaintiffs have been diligent in this matter and have good cause to bring this proposed amendment after the deadline to amend to add parties.  In large part, Plaintiffs good cause rests on a critical text message that was concealed from Plaintiffs for months until after the deadline to amend.  In addition to having good cause to bring this amendment now, Plaintiffs' claims are not futile.

### Factual Background[2]

**A.    The deliberate indifference and negligence preceding the involvement of N.P. Eriksson-Kotschevar.**

Nick was a 37-year-old man at the time of his death, who had struggled with addiction following a motor vehicle accident that resulted in a traumatic brain injury. (SAC ¶¶ 2, 48-50.)  Nick's history included inhalant abuse or "huffing," which is well-known in the medical community for its serious medical consequences, including death. (*Id.* ¶¶ 24 – 41.)  After a period of sobriety in 2022, Nick relapsed, became homeless, and presented to the CentraCare St. Cloud Hospital Emergency Department ("CC Hospital ED") on September 16, 2022, after consuming vodka, inhalants, and experiencing suicidal ideations.  (*Id.* ¶ 51.)  Nick was admitted, stabilized, and discharged two days later on September 18, 2022.  (*Id.* ¶¶ 48 – 61.)

---

[2] Plaintiffs will not provide a complete recitation of all facts in their proposed SAC, but those facts are incorporated by reference in their entirety.

On October 16, 2022, at approximately 7:11 p.m., Nick was arrested by St. Cloud Police Officers after being found huffing at a Walmart.  (*Id.* ¶¶ 62 – 68.)  The arresting officers transported Nick to the CC Hospital ED.  (*Id.* ¶¶ 69.)  During the transport, Nick could be seen on video struggling to breathe and was stating things such as, "Oh my god. It's a heart attack."  (*Id.* ¶¶ 71-75.)

Nick was first seen by Dr. Falvey at CC Hospital ED at 7:37 p.m.  (*Id.* ¶ 79.)  Nick repeatedly expressed difficulty breathing, saying things to the effect of "I can't breathe, I can't move, I'm going to die."  (*Id.* ¶¶ 79 – 81.)  Despite the fact that Nick had an abnormal EKG and other abnormal vital signs, Dr. Falvey discharged Nick to the Stearns County Jail ("Jail") at 8:50 p.m., approximately 80 minutes after Nick arrived.  (*Id.* ¶¶ 122 – 131.)  Plaintiffs have previously alleged, and continue to allege, that Dr. Falvey violated the standard of care in relation to his interactions with Nick at CC Hospital ED. (*Id.* ¶¶ 131 – 135.)

Nick arrived at the Jail at approximately 9:00 p.m.  (*Id.* ¶ 136.)  Nick's hospital discharge paperwork reflected that he should "[r]eturn to the ED if [he] develop[ed] new or worsening symptoms."  (*Id.* ¶ 139.)  Nick could not stand on his own, was covered in sweat, wheezing, shaking, drooling, and unable to speak in full or coherent sentences upon his arrival at the Jail.  (*Id.* ¶¶ 145 – 148.)  The Jail failed to conduct any of the necessary screening, falsely suggesting that Nick was uncooperative with intake, when in fact Nick was cooperative.  (*Id.* ¶ 149 – 158.)  Nick's condition continued to deteriorate at the Jail, eventually prompting correctional officers to take his vitals.  (*Id.* ¶ 163 – 187.) Jail Sgt. Steven Polack ("Sgt. Polack") observed that Nick was having difficulty

3

breathing and was tachycardic, but he stated that he was unable to obtain a good blood pressure reading from Nick.  (*Id.* ¶ 184-187.)

After observing that Nick was tachycardic and difficulty breathing, Sgt. Polack contacted the on-call medical provider from CC Clinic.  (*Id.* 188.)  Nurse Practitioner Catherine Standfuss ("N.P. Standfuss") was not the on-call provider but received Sgt. Polack's call.  (*Id.* ¶ 189.)  At 9:50, Sgt. Polack drafted the following Jail Staff Medical Documentation Form:

(*Id.* ¶ 192.). On October 17, 2022, approximately five hours after Nick's death, Sgt.

Polack also drafted a report, where he described his conversation with N.P. Standfuss as

follows:

> At approximately 2130 hours I decided to conduct a vitals check on Norberg due to him breathing heavy and stating that he was having difficulty breathing. I and Officer Schmitz entered the cell and applied handcuffs to Norberg. We were unable to obtain a good blood-pressure reading on Norberg due to him moving. We did get a O2 saturation level that stayed between 96% and 99% and a pulse rate between 135-147 beats per minute. I contacted the on-call medical provider and updated her with all the information that I had. I was advised to give Norberg 1mg of Ativan from the medical E-kit and follow-up with her in 2 hours if the inmates chief complaint became worse.

(*Id.* ¶ 193.)

N.P. Standfuss charted in her note, which was signed two days later, on October

19, 2022 as follows:

**Other Provider Notes**

Telephone Encounter by Standfuss, Catherine J, APRN,CNP at 10/16/2022 2135

| | | |
|---|---|---|
| Author: Standfuss, Catherine J, APRN,CNP | Service: — | Author Type: Nurse Practitioner |
| Filed: 10/19/2022 5:30 PM | Encounter Date: 10/17/2022 | Status: Addendum |
| Editor: Standfuss, Catherine J, APRN,CNP (Nurse Practitioner) | | |

Correctional care on-call coverage (late entry). Called by Sgt on duty at Stearns County Jail regarding inmate at approximately 2135. Note - I was not the scheduled on-call provider at this time however did take the call. Sgt on duty reports inmate was picked up by law enforcement about 90 minutes prior, per report was found in a store surrounded by multiple cans of duster. He was brought to the ER and cleared. The ER note is not yet available for review at the time of the call, however I did review hospital discharge summary dated 9/18/2022 during the call. Concerns from Sgt were agitation and that they were having a difficult time obtaining vitals due to agitation. He was noted to have O2 saturation between 96-98% on room air. His blood pressure was normal per report. He was tachycardic between 110-140. I note in DC summary from 9/18/2022 that he was also noted to have variable BP/HR and did have Hospitalist consult prior to discharge. I did ask the Sgt to administer Ativan 1 mg now to target symptoms of agitation and to call within 1-2 hours if the agitation has not improved. I did then notify the on-call provider (Bri Eriksson, CNP) of the call, should there be any additional calls overnight.

Electronically signed by Standfuss, Catherine J, APRN,CNP at 10/19/2022 5:30 PM

(*Id.* ¶ 195.)  N.P. Standfuss did not accurately chart her conversation with Sgt. Polack. (*Id.* ¶ 196.)  Sgt. Polack wrote after Nick's death that he "provided and updated her with all the information that [he] had."  N.P. Standfuss did not chart the critical information conveyed to her by Sgt. Polack, particularly that Nick was having trouble breathing. (*Id.* ¶ 198.)  N.P. Standfuss also charted that Nick's heart rate was between 110 – 140, when Sgt. Polack informed her that Nick's pulse was 135 – 147, i.e., that he was severely tachycardic.  (*Id.* ¶ 199.)  Despite the normal oxygen saturation level, Sgt. Polack provided N.P. Standfuss with information that reflected an inmate with serious medical needs and potentially life-threatening conditions.  (*Id.* ¶ 200.)  Even the oxygen saturation level should have been viewed skeptically by N.P. Standfuss, given that Nick's vitals were not taken by medical professionals and N.P. Standfuss knew that Sgt. Polack struggled to obtain vital readings.  (*Id.* ¶ 201.)

As an employee or other agent of CC System, N.P. Standfuss had access to Nick's CC Hospital ED records.  (*Id.* ¶ 202.)  N.P. Standfuss acknowledged she could not yet view the ED Visit chart notes, so she had no ability to compare Nick's vitals and signs being reported by the Jail to his status earlier that evening.  (*Id.* ¶ 203.)  N.P. Standfuss made no effort to contact the ED providers to learn about Nick's medical condition, even though notes from that visit were not yet available for her viewing.  (*Id.* ¶ 204.) Ultimately, N.P. Standfuss simply prescribed Nick with 1 mg of Ativan, a sedative, and provided correctional staff with no instruction other than to call back if Nick did not improve.  (*Id.* ¶ 195.)  Plaintiffs have alleged and continue to allege that N.P. Standfuss

was deliberately indifference towards Nick's serious medical needs and violated the applicable standard of care.

**B.    The deliberate indifference and violation of the standard of care by N.P. Eriksson-Kotschevar.**

In written discovery to CC Clinic and Standfuss, Plaintiffs requested: "A complete, certified copy of Decedent's medical records and all electronically stored documents and communications regarding Decedent in [their] possession."[3]  On October 14, 2024, CC Clinic and Standfuss responded, producing only medical records and no communications related to Nick. Plaintiffs took the deposition of N.P. Eriksson-Kotschevar on March 12, 2025, and for the first time learned that these defendants were in possession of a text communication directly related to Nick's medical care.  (SAC ¶ 220).[4]

The text message is reflected as follows:

---

[3] Storms Dec. Ex. C, Defendants CentraCare Clinic and Catherine Standfuss, APRN's Responses to Plaintiff's First Set of Combined Requests for Production of Documents.
[4] Plaintiffs also learned two days ago (5/13/25) during the deposition of N.P. Standfuss that N.P. Standfuss has never searched all of her text messages to see if she has other text communications related to Nick.  This was the case even though her deposition was continued from March 12, 2025, until yesterday, so that she could consult with criminal counsel following the disclosure of the text message reflected below.  Storms Dec. ¶ 6.



(*Id.* ¶¶ 220, 221.)

N.P. Eriksson-Kotschevar was the on-call provider from CC Clinic for the Jail on the night of Nick's death. (*Id.* ¶ 229.) Like N.P. Standfuss, N.P. Eriksson-Kotschevar was also aware of the serious harm that can result from huffing. (*Id.* ¶ 230.) For example, N.P. Eriksson-Kotschevar knew that for someone who was huffing, being tachycardic had the potential to be a sign and symptom of a medical emergency. (*Id.* ¶ 231.). N.P. Eriksson-Kotschevar also knew that huffing was dangerous and had the potential to cause death in a patient by causing a cardiovascular event. (*Id.* ¶ 232.)

N.P. Eriksson-Kotschevar learned from N.P. Standfuss that that Nick was "huffing a bunch," "pretty tachycardic," "probably still high," and released from the ER so quickly that it was concerning. (*Id.* ¶ 233.) She responded with this plan to sedate Nick with Ativan with a casual attitude despite the known risks of respiratory and cardiovascular depression, especially for a patient with a history of polysubstance use and inhalant abuse. (*Id.* ¶ 234.) N.P. Eriksson-Kotschevar found N.P. Standfuss's plan to sedate Nick as funny as reflected by her response "Lol…," which means "laugh out loud." (*Id.* ¶ 235.)

Despite being the on-call provider who agreed to take over Nick's care for the evening, N.P. Eriksson- Kotschevar received no information regarding Nick's other vitals. (*Id.* ¶ 236.) Any reasonable provider receiving this information from N.P. Standfuss would have understood that Nick had a serious medical condition and made

further inquiry into Nick's other vital signs and the plan to monitor Nick for the evening. (*Id.* ¶ 237.)  No reasonable provider could have believed that a plan of simply sedating Nick under these circumstances without a planned follow up was within the standard of care.  (*Id.* ¶ 238.)  Despite having the opportunity to intervene and ensure Nick received proper care, N.P. Eriksson-Kotschevar acted with deliberate indifference by failing to do anything to help Nick.  (*Id.* ¶ 239.)

N.P. Eriksson-Kotschevar did not make any attempt to contact Jail staff directly to gather additional clinical information about Nick's condition.  (*Id.* ¶ 240.)  She did not inquire into Nick's vital signs, behavioral presentation, or the Jail's monitoring capabilities—nor did she take steps to independently review Nick's ED chart or reach out to the discharging ED provider.  (*Id.* ¶ 241.)  N.P. Eriksson-Kotschevar failed to implement any plan for close monitoring or reassessment of Nick, despite knowing he had been exposed to potentially life-threatening substances and was exhibiting signs of significant autonomic dysfunction.  (*Id.* ¶ 242.)  Instead, she passively endorsed a plan of sedation in a non-medical jail setting without taking steps to ensure appropriate oversight or follow-up.  (*Id.* ¶ 243.)

The standard of care required that N.P. Eriksson-Kotschevar take clinical responsibility for evaluating and managing Nick's care.  (*Id.* ¶ 244.)  As the on-call provider, she had the duty to: (a) initiate a meaningful clinical assessment, including follow-up questions regarding vitals, appearance, and behavior; (b) require immediate in-person evaluation if the patient's status was uncertain or unstable; (c) ensure safe administration and monitoring of any medication, particularly controlled substances with

sedative effects; and (d) determine that Nick was located in an environment capable of managing a high-risk patient. (*Id.* ¶ 245.) She failed each of these duties. (*Id.* ¶ 246.)

Her actions not only deviated from the standard of care but reflected deliberate indifference. (*Id.* ¶ 247.) Her failure to act was not a matter of clinical judgment, but rather a knowing and conscious disregard of Nick's obvious and urgent need for medical attention. (*Id.* ¶ 248.) This disregard is underscored by her failure to follow up after her communication with N.P. Standfuss or to implement a specific plan for reassessment, despite knowing that Nick's condition involved recent ED discharge, continued tachycardia, and exposure to a neurotoxic and cardiotoxic inhalant substance. (*Id.* ¶ 249.)

Had Nick received treatment within the standard of care from N.P. Eriksson-Kotschevar, she would have directed correctional staff to return Nick to the CC Hospital ED. (*Id.* ¶ 250.) Had Nick been returned to the CC Hospital ED and received reasonable medical care, more likely than not, Nick would not have died on October 17, 2022. (*Id.* ¶ 251.) Had N.P. Eriksson-Kotschevar complied with the standard of care, more likely than not, Nick would not have died on October 17, 2022. (*Id.* ¶ 252.)

## <u>Argument</u>

**I.    Plaintiffs have good cause for the timing of this motion to amend their complaint.**

Motions for leave to file an amended complaint outside of the scheduling order require a showing of good cause. *Kmak v. Am. Century Comps., Inc.*, 873 F.3d 1030,

1034 (8th Cir. 2017) (quotation omitted).[5] "The primary measure of good cause is the movant's diligence." *Id. See also Portz v. St. Cloud St. Univ.*, No. 16-1115 (JRT/LIB), 2017 WL 3332220, at *2 (D. Minn. Aug. 4, 2017) (unpublished, reversing magistrate judge order denying leave to amend complaint). "[D]iligence is the primary factor for assessing good cause…" *Portz*, 2017 WL 3332220, at *3 (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006)). In *Portz*, the court found that, despite the motion to amend the complaint being brought after the deadline set forth in the scheduling order, Plaintiffs acted diligently within the context of all applicable deadlines and a defendant's delay in production "likely prevented Plaintiffs from receiving what they viewed as necessary information to bring these additional claims." *Portz*, 2017 WL 3332220, at *4.

First, Plaintiffs were diligent in serving written discovery, serving all four sets of defendants with written discovery on September 13, 2024.[6] Second, Plaintiffs continued to receive rolling sets of discovery and engaged in meet and confer efforts to resolve discovery disputes until January 2025.[7] Third, Plaintiffs began attempting to schedule depositions in December to keep this matter moving diligently, despite concerns about discovery disputes.[8] Due to making collaborative efforts to organize the schedules of many law firms following the resolution of the outstanding discovery issues, neither N.P.

---

[5] It is Plaintiffs' understanding that CC Clinic and Standfuss are objecting to this amendment on grounds of futility and not to untimeliness (due primarily to the late discovery disclosure), and therefore futility should be the focus of the Court's inquiry.
[6] Storms. Dec. ¶ 7.
[7] *Id.* ¶ 8.
[8] *Id.* ¶ 9.

Standfuss nor N.P. Eriksson-Kotschevar were scheduled until March 12, 2025 (with N.P. Standfuss's deposition being rescheduled).[9]  Plaintiffs noticed those depositions on January 3, 2025.[10]

Fourth, prior to the disclosure of the critical text message and the deposition of N.P. Eriksson-Kotschevar, it appeared that the only evidence of N.P. Eriksson-Kotschevar's involvement in Nick's care prior to his death was a one-line passing reference in N.P. Standfuss's chart note, which Plaintiffs reasonably questioned the veracity of given the contradictions in N.P. Standfuss's chart note compared to the events as documented by Sgt. Polack.[11]  Certainly, Plaintiffs had no evidence of N.P. Eriksson-Kotschevar's complete deliberate indifference towards Nick's care as evidenced in the subject text message until that text message was disclosed.  Fifth, Plaintiffs moved diligently to meet and confer on the amendment issue, contacting chambers and (following an exchange of phone calls) obtaining a hearing date by March 31, 2025, after learning that CC Clinic and N.P. Standfuss would not consent to the amendment.[12]

Finally, Plaintiffs have moved diligently within the construct of all deadlines in this case, with discovery still open for over 11 months, expert disclosures not due from the Defendants until February 1, 2026, and trial not set until October 1, 2026.  Thus, in addition to Plaintiffs' diligence, there is no prejudice to Defendants.  Accordingly, good

---

[9] *Id.* ¶ 10.
[10] *Id.* ¶11.
[11] *Id.* ¶12.
[12] *Id.* ¶ 13.

cause exists for the Court to permit Plaintiffs to amend their complaint after the time contemplated by the scheduling order.

**II.     Plaintiffs' proposed claims against N.P. Eriksson-Kotschevar are not futile.**

**A.     Futility standard of review is akin to a 12(b)(6) standard for a motion to dismiss.**

"Futility is a common basis for denying a proposed amendment … Amendment is futile where the proposed amended complaint would not withstand a Rule 12(b)(6) motion to dismiss." *Brenner v. Asfeld*, Case No. 18-cv-2383 (NEB/ECW), 2019 WL 2358451, at *3 (D. Minn. June 4, 2019) (citing *Schlief v. Nu-Source, Inc.*, No. CV 10–4477 (DWF/SRN), 2011 WL 13140709, at *1 (D. Minn. Aug. 22, 2011); *ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 793 (D. Minn. 2019) (citing *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010)); *see also Cornelia I. Crowell GST Trust v. Possis Medical, Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell At. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Although the plausibility standard "requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility,'" it is not a "probability requirement." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "Thus 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). A court must "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural*

*Polymer Grp.*, 592 F.3d 893. 896 n.4 (8th Cir. 2010); *Braden*, 588 F.3d at 594 (quotation omitted).  In assessing plausibility, the reviewing court accepts as true the complaint's factual allegations and draws all reasonable inferences in a plaintiff's favor.  *Aschcroft v. Iqbal*, 556 U.S. 622, 678 (2009).

> **B.     Plaintiffs have stated a plausible state law claim for wrongful death against N.P. Eriksson-Kotschevar for her violations of the standard of care.**

Minnesota Statute § 573.02 creates a statutory cause of action in Minnesota for wrongful acts and omissions that cause a death.  To establish a claim of medical malpractice as the underlying wrong, a plaintiff must eventually prove the following three elements through expert testimony: (1) standard of care in the relevant medical community, (2) that the defendant breached the accepted standard of care, and (3) that this breach caused harm.  *Becker v. Mayo Found.*, 737 N.W.2d 200, 216 (Minn. 2007). At the commencement of a case, a plaintiff pursuing a claim in medical malpractice under Minnesota law is only required to set forth a prima facie case through an affidavit of expert review stating that:

> the facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff…

Minn. Stat. § 145.682, subd. 3.  As set forth in Plaintiffs' proposed SAC, Plaintiffs have satisfied this requirement and shall provide such an affidavit with their SAC.[13]

---

[13] Storms Dec. Ex. D.

It is Plaintiffs' understanding that this amendment will be challenged by CC Clinic and N.P. Standfuss on grounds that Eriksson-Kotschevar never had a provider-patient relationship with Nick.  The Minnesota Supreme Court has "never held that such a relationship is necessary to maintain a malpractice action under Minnesota law." *Warren v. Dinter*, 926 N.W.2d 370, 375 (Minn. 2019).  Instead, "when there is no express physician-patient relationship, we have turned to the traditional inquiry of whether a tort duty has been created by foreseeability of harm." *Id.*

What risk is foreseeable "depends heavily on the facts and circumstances of each case." *Doe 169 v. Brandon*, 845 N.W.2d 174, 179 (Minn. 2014).  In medical malpractice cases, the issue of foreseeability rests heavily on the proffered expert opinions.  *See, e.g., Warren*, 926 N.W.2d at 378; *see also Berres v. Anderson*, 561 N.W.2d 919, 925 (Minn. App. 1997).  "In close cases, the issue of foreseeability should be submitted to the jury." *Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011) (citation omitted); *see also Senogles v. Carlson*, 902 N.W.2d 38, 43 (Minn. 2017) (citations omitted).

Plaintiffs plausibly allege that N.P. Eriksson-Kotschevar, as the on-call provider, assumed responsibility for Nick's care but failed to meet the standard of care.  She knew that huffing inhalants was potentially deadly, that Nick had been huffing, was "pretty tachycardic," and had just been discharged from the ER so quickly that it raised concern.  Yet, she casually endorsed a plan to sedate Nick with Ativan—responding "Lol…"— without requesting his vitals, contacting Jail staff, reviewing his medical records, or confirming whether any meaningful clinical assessment had been performed.  *See, e.g., Ouellete v. Subak*, 391 N.W.2d 810, 816 (Minn. 1986) ("[A] doctor must... use

reasonable care to obtain the information needed to exercise his or her professional judgment, and an unsuccessful method of treatment chosen because of a failure to use such reasonable care would be negligence."). She failed to implement any plan for monitoring or reassessment, despite knowing Nick was in a non-medical setting with ongoing risks of cardiovascular collapse.

These facts plausibly allege that N.P. Eriksson-Kotschevar breached the standard of care and that her failure more likely than not caused Nick's death. It was entirely foreseeable that endorsing sedation without assessment or monitoring in these circumstances could result in harm. At a minimum, questions of fact related to foreseeability exist to be addressed on summary judgment, not this threshold stage of the proceedings. Having assumed clinical responsibility for Nick's care, N.P. Eriksson-Kotschevar had the authority and duty to act, and Plaintiffs allege she failed to do so. Plaintiffs have therefore stated a non-futile claim for wrongful death based on medical malpractice.[14]

### C.    Plaintiffs' claims of deliberate indifference under the Fourteenth Amendment are not futile.

#### i.    The basic elements of a claim under 42 U.S.C. § 1983.

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564,

---

[14] For the same reasons, Plaintiffs have plausibly alleged a survival claim. That claim is merely an alternative theory should a jury conclude that N.P. Eriksson-Kotschevar caused Nick harm but not his death.

571–72 (8th Cir. 2009).  While CC Clinic is nominally private, Plaintiffs have plausibly alleged that the CC Clinic and its employees, such as N.P. Eriksson-Kotschevar acted under color of state law for purposes of Section 1983.  *See West v. Atkins*, 487 U.S. 42, 56-57 (1988) (private doctor treating prisoners acted under color of law); *accord Burke v. North Dakota Dept. of Corrections and Rehab.*, 294 F.3d 1043 (8th Cir. 2002); *Montano v. Hedgepeth*, 120 F.3d 844, 849-50 (8th Cir. 1997); *see also Doe v. North Homes, Inc.*, 11 F.4th 633, 637 (8th Cir. 2021) (finding private juvenile detention center acted under color of state law and noting that this question is often a fact-bound inquiry).

While N.P. Eriksson-Kotschevar acted under color of state law, she can **never** be entitled to qualified immunity.  *See Richardson v. McKnight*, 521 U.S. 339 (1997) (employees of private prison management firm not entitled to qualified immunity on Section 1983 claims); *accord Davis v. Buchanan County, Mo.*, 11 F.4th 604 (8th Cir. 2021).  Accordingly, the focus of this Court's analysis on the Section 1983 claim against N.P. Eriksson-Kotschevar is solely whether Plaintiff have alleged plausible Fourteenth Amendment violations.

### ii.    Plaintiffs Fourteenth Amendment claims against N.P. Eriksson-Kotschevar are not futile.

Plaintiffs allege under the Fourteenth Amendment that N.P. Eriksson-Kotschevar denied Nick adequate medical care while he was detained at the Jail.  The Fourteenth Amendment Due Process Clause applies to such claims by pretrial detainees, but it makes little difference as courts apply the same test as they would for an Eighth Amendment claim for deliberate indifference.  *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007)

(citations omitted). In order to state a claim for deliberate indifference under the Fourteenth Amendment, a plaintiff must establish that he suffered "from an objectively serious medical need, and that prison officials knew of the need but deliberately disregarded it." *Dadd v. Anoka County*, 827 F.3d 749, 755 (8th Cir. 2016). "Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact." *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997)

The objective prong is a question of fact. *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011). "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). Courts in our district have recognized the existence of fact questions regarding the objectively serious prong on summary judgment in other cases involving inmates who have become ill under the influence of and/or withdrawing from substances. *See, e.g., Casler v. MEnD Correctional Care, PLLC*, 18-cv-1020 (WMW/LIB), 2020 WL 7249877, at *19-20 (D. Minn. Sept. 28, 2020); *see also Erickson v. Pope County*, Minn., 19-cv-3061 (SRN/LIB), 2022 WL 17411091, at *19-21 (D. Minn. May 6, 2022).

Plaintiffs have plausibly alleged that Nick had objectively serious medical needs at the time N.P. Eriksson-Kotschevar became involved in his care. Nick had a well-documented history of inhalant abuse, which is known to cause life-threatening cardiac and respiratory complications. Earlier that same evening, Nick had presented to the

emergency room in visible distress, repeatedly stating "I can't breathe, I'm going to die," and was found to have a dangerously elevated heart rate in the 160s, an abnormal ECG, and symptoms consistent with serious cardiac dysfunction.  Upon arrival at the Jail, he was unable to stand, covered in sweat, drooling, wheezing, shaking, and unable to speak coherently—all obvious signs of severe medical distress recognizable to any layperson.

The second prong is a subjective inquiry, requiring a plaintiff to show that the officials "actually knew that [the inmate] needed medical care and disregarded 'a known risk to the [inmate's] health." *Id.* (quoting *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). This requires a showing greater than negligence, but less than "purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 914-15.  A plaintiff may prove the defendant's mental state "through circumstantial evidence, as a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the medical need was obvious." *Id.* (quoting *Vaughn v. Gray*, 557 F.3d 904, 908–09 (8th Cir. 2009)) (internal quotations and alteration omitted).  Evidence of some medical care is insufficient to disprove deliberate indifference, as a plaintiff may also prove deliberate indifference by establishing that a provider's course of treatment "so deviated from professional standards that it amounted to deliberate indifference…" *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).

In the similar cases of *Casler* and *Erickson*, the courts engaged in extensive factual analysis to address the question of deliberate indifference, highlighting how inappropriate it is to make a futility finding at this stage of the proceedings, particularly given

Plaintiffs' extensive factual allegations supporting indifference.  For example, when N.P. Eriksson-Kotschevar received the report from N.P. Standfuss, she was told that Nick had been "huffing a bunch," was "pretty tachycardic," "probably still high," and had been discharged from the ER so quickly that it raised concern.  These facts, combined with her own professional knowledge of the life-threatening risks of inhalant abuse and tachycardia, plausibly allege that Nick's condition presented an objectively serious medical need.  In the face of these serious facts, N.P. Eriksson-Kotschevar laughed out loud.

If the allegations against Nurse Sticha in *Erickson v. Pope County* were sufficient to present a jury question on deliberate indifference, then Plaintiffs' allegations here present an even stronger case.  *See generally* at 2022 WL 17411091, at *31-32. In *Erickson*, Sticha was faulted for failing to act on limited information provided by jail staff about a high BAC and potential withdrawal risk.  She never saw Erickson, never asked for more details about his presentation, and simply told staff to watch for symptoms.  Despite the lack of detailed clinical information, the court held a jury could find that Sticha acted with deliberate indifference by failing to inquire further or take protective action based on the foreseeable risk of alcohol withdrawal.

Here, N.P. Eriksson-Kotschevar had far more direct and concerning information. She was informed that Nick had just been in the ER after huffing—a known cause of sudden cardiac death—was "pretty tachycardic," and was probably still high.  Unlike Sticha, who gave at least some minimal safety instruction, N.P. Eriksson-Kotschevar casually endorsed sedation with Ativan, responded "Lol…" to the report, and made no

effort to gather additional clinical information, implement monitoring, or ensure reassessment. She disregarded clear information from N.P. Standfuss about Nick's rapid ER discharge and failed to provide any meaningful medical oversight. This conduct reflects a knowing disregard for an obvious risk, making Plaintiffs' deliberate indifference claim even stronger than the one upheld in *Erickson*. Plaintiffs also plausibly allege that N.P. Eriksson-Kotschevar so deviated from the applicable standards of care that her conduct amounts to deliberate indifference, which, like the medical malpractice claim, will necessarily rely upon expert testimony.

Finally, a defendant can also be held liable in her individual capacity for a failure to intervene and prevent others from causing constitutional harms, if they also act with deliberate indifference to the constitutional violation. *See, e.g., Bucker v. Hollins*, 983 F.2d 119, 122-23 (8th Cir. 1993). Plaintiffs have similarly alleged that N.P. Standfuss was deliberately indifferent to Nick's same medical needs. The SAC, like the preceding First Amended Complaint, details similar allegations of deliberate indifference towards N.P. Standfuss. N.P. Eriksson-Kotschevar knew that N.P. Standfuss was in possession of and (laughingly) disregarding Nicks' objectively serious medical needs. Since Nick died several hours after N.P. Standfuss contacted N.P. Eriksson-Kotschevar, N.P. Eriksson-Kotschevar had a realistic opportunity to intervene and prevent N.P. Standfuss's unconstitutional conduct towards Nick, as N.P. Eriksson-Kotschevar could have acted within the standard of care by contacting the Jail, obtaining complete information, and direct that Nick be returned to the hospital. Ultimately, Plaintiffs' Fourteenth Amendment claims against N.P. Eriksson-Kotschevar are not futile.

## **Conclusion**

Plaintiffs have good cause for the timing of this amendment. Their claims against N.P. Eriksson-Kotschevar are not futile. Accordingly, Plaintiffs should be granted leave to file and serve their Second Amendment Complaint.

**STORMS DWORAK LLC**

Dated: May 15, 2025

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Paul C. Dworak, #391070
Ryan O. Vettleson, #312915
Naomi E. H. Martin, #0402332
Joseph T. Heegaard, #0401544
Isabel L. McClure, #401759
222 South 9th Street, Suite 470
Minneapolis, MN 55402
Phone: 612.455.7055
Fax: 612.455.7051
jeff@stormsdworak.com
paul@stormsdworak.com
ryan@stormsdworak.com
naomi@stormsdworak.com
joe@stormsdworak.com
isabel@stormsdworak.com

*Attorneys for Plaintiffs*